# Wytheville

EDGAR L. SIMPSON v. ETHEL LEWIS GREENBURG SIMPSON.

June 14, 1934.

Present, Campbell, C. J., and Epes, Hudgins, Gregory and
Browning, JJ.

*On Rehearing.*

The opinion states the case.

*Page, Page & Page* and *Ivor A. Page, Jr.,* for the appellant.

*N. T. Green* and *W. W. Elliott,* for the appellee.

EPES, J., delivered the opinion of the court.

A decree was entered in this case by this court on June 15, 1933. A petition for a rehearing was filed and a rehearing granted, and the cause is now before us upon a rehearing.

The facts material to a decision of the cause, and some of the other facts proven which will give a better appreciation of the questions involved, are as follows:

On December 25, 1913, the appellee married J. E. Greenburg at Valdosta, Georgia. Of this marriage two children were born, who are living at this time. In 1922 or 1923 Greenburg deserted his wife and children and disappeared. At this time they were living in Norfolk, Virginia, where they had resided for several years. The record does not establish the exact day on which Greenburg left his wife and children and disappeared, but it was either on or prior to September 2, 1923.

The appellee says at one place in her testimony that the last time she saw him was "in 1921 or 1922," and at another place "in 1922." The chief probation officer of the juvenile and domestic relations court of the city of Norfolk, who was introduced as a witness by the appellant, testified that "on or about August 23, 1923, Mrs. Greenburg

registered a complaint in that court against J. E. Greenburg alleging that he had deserted her and their two children on December 2, 1922. The only thing in the record which is in conflict with the above testimony are the allegations in appellee's bill for a divorce from Greenburg and in her cross-bill filed in this cause that he deserted her on September 2, 1923.

The appellee testified, without contradiction, to the following effect: We (Greenburg and herself) were on good terms when he left Norfolk and that morning he borrowed about $10 from me. "The last time I saw him was in the old Barr home at the foot of Butte street. He was out of work—as a matter of fact, he wasn't able to work because he was suffering with diabetes. A few years before this he was operated on for double rupture and locked bowels * * * . When he left Norfolk he said he was going to Buffalo" (New York). In reply to the question, did he tell you where he was going? she said: "He was without work and sick. He didn't know what to do. He was very deeply in debt here. He said he was going to Buffalo. A day or two before that he said something about going to Roanoke. I don't know where he went." * * * "He had talked about going away for several weeks." At the time he went away he was about thirty-four years old. Neither she nor any member of his own family had heard from him since he left.

The appellee enlisted the assistance of the Council of Jewish Women in Norfolk in trying to locate her husband. On January 26, 1926, the National Desertion Bureau telegraphed the Council of Jewish Women that "Joseph Greenburg was located at 820 North Howard street, Baltimore, Maryland." The next day Mrs. Greenburg swore out a warrant against her husband for non-support. This warrant was sent by the chief probation officer of the juvenile and domestic relations court of Norfolk to the chief of detectives of Baltimore, from whom he received a letter saying that Greenburg was sick and confined in a hospital, but that they would take him in custody as soon

as he was discharged. However, before the man was discharged from the hospital, the Council of Jewish Women received advice from the National Desertion Bureau that they had ascertained that the Greenburg in the hospital in Baltimore was not the Greenburg for whom the warrant had been sworn out. This testimony was given by the chief probation officer, who was introduced by appellant.

Appellee also testified that she had heard from others that her husband had died in a hospital in Baltimore in 1926; but that she later had information from others which led her to believe that the person to whom these reports had reference was some other person by the name of Greenburg.

We shall not recite the evidence relating to the search for Greenburg made by Mrs. Greenburg, the Council of Jewish Women, and the members of Greenburg's own family. It is sufficient to give rise to a presumption, after the lapse of seven years from the time he left home in Norfolk, that he had died at some time during that seven year period.[1]

After Greenburg left her, the defendant in error secured a position and supported herself and her children until she married appellant.

In January, 1930, Mrs. Greenburg came into contact with appellant, and in April following, with a knowledge of the things to which she had testified, he urged her to get a divorce and marry him. In June she became engaged to him; but out of precaution she consulted a lawyer as to whether she could lawfully marry him without getting a divorce from Greenburg. He advised her that the safe course to pursue would be to get a divorce on the grounds of desertion before marrying again. This procedure met with appellant's approval and he offered to pay the costs

---

[1] At the time the decree of June 15, 1933, was entered by this court in this cause, the writer entertained much doubt as to whether this was true. But upon a re-examination of the record he finds that he was mistaken about this.

of getting the divorce, and did pay a part of the attorney's fees. However, when he discovered that the statute required that a divorced person wait six months after the decree of divorce has been entered before remarrying, he consulted another lawyer. This lawyer advised him that a divorce was not necessary, as Greenburg had been gone for seven years and was legally dead, and after that he made no further payments of costs or attorney's fees connected with the divorce proceedings.

Mrs. Greenburg instituted her suit for divorce *a vinculo* from Greenburg on the ground of desertion in the Circuit Court for the city of Norfolk some time between April and August 12, 1930; and he was proceeded against by an order of publication.

In her bill for divorce, which is sworn to by her, she alleged that "J. E. Greenburg did on the 2d day of September, 1923, wilfully desert and abandon your complainant * * * and that your complainant has never heard from him since that day nor does she know where he is or "whether he be *dead or alive.*" (Italics ours.)

On September 5, 1930, the court entered a decree in this cause granting Mrs. Greenburg a divorce from the bonds of matrimony. The decree recites that Greenburg has deserted his wife and children "for a period of over three years, [and] that his whereabouts have been unknown and still are unknown to" her. This decree strikes the cause from the docket but provides that "leave is reserved to the parties or either of them to make application in this court for further orders as are authorized by law."

On November 26, 1930, the appellee and appellant were married in Maryland. Very shortly afterwards marital troubles began which have culminated in this suit.

On August 1, 1931, appellant instituted his suit against appellee praying for an annulment of his marriage to her on the ground that she had married him within less than six months after the entry of the decree divorcing her from Greenburg. His bill is wholly predicated upon the provi-

sions of section 5113, Code Va. 1919. It contains no allegation that Greenburg was living at the time he and appellee were married.

Appellee filed her answer and cross-bill in which she alleges that her former husband, J. E. Greenburg, deserted her and their children on September 2, 1923, with the declared intention of going to Baltimore, Maryland, for the purpose of procuring employment; that though she, his mother and his sister had made diligent inquiry and search to discover his whereabouts and whether he was dead or alive, they had never been able to learn anything about him; that, in view of these facts, after the lapse of seven years from the time he left her, he was and is presumed to be dead, and was in fact dead when she married appellant; that before their marriage appellant was acquainted with the facts giving rise to the presumption that Greenburg was dead, and upon the advice of counsel, urged her to marry him, which she did, relying upon the presumption that Greenburg was dead; and that appellant has been guilty of cruelty to her which entitles her to a divorce *a mensa*. The facts relating to her suit for divorce from Greenburg are set forth substantially as they have been heretofore stated. She prays that her marriage to appellant be decreed a valid marriage; that she be granted a divorce *a mensa* from him, and also that she be granted alimony *pendente lite* and permanent alimony.

Appellant filed his answer and cross-bill to the cross-bill filed by appellee. In it he alleges that, if it should be held that his marriage to her was not void, she has been guilty of desertion, and prays a divorce *a mensa* from her on that ground.

No proof was made that Greenburg was alive at any time after he left the appellee and their children. Whether he left home on September 2, 1923, as the appellee alleges in her pleading, or in 1922 as she says in her testimony, is immaterial. Whichever it was, more than seven years had elapsed between the time Greenburg left home

and the time the decree divorcing her from Greenburg was entered.

The material facts proven which bear upon the validity or invalidity of the marriage between appellant and appellee are as has been stated in the first few pages of this opinion. We deem it unnecessary to set forth the testimony bearing upon her charge that he was guilty of cruelty to her, or that bearing upon his charge that, if their marriage was not void, she has been guilty of deserting him. It is sufficient to say that we are of opinion that the evidence sustains her charge, and fails to sustain his.

The case was submitted to the court on appellant's bill, appellee's answer and cross-bill, and appellant's answer and cross-bill to appellee's cross-bill, and upon the evidence.

On April 23, 1932, the court entered its decree in which it denied the relief prayed in appellant's bill and also that prayed in his cross-bill, and granted appellee (Mrs. Simpson) a divorce *a mensa* as prayed in her cross-bill. However, in this decree it reserved for future adjudication all questions relating to alimony and counsel fees, and committed the cause to a commissioner for a report on these questions.

By a former decree it had ordered appellant to pay to appellee $25 per month during the pendency of the cause. On August 1, 1932, there was due to her under that order $702 for temporary alimony. In its decree of August 1, 1932, the court allowed appellee $1,000 for attorney's fees and the lump sum of $3,000 for permanent alimony, and entered a judgment for her for those amounts, and also for the sum of $702 for past due installments of the temporary alimony. It also decreed that Simpson "continue to pay to the said defendant * * * $25 a week as temporary alimony on Monday of each week, after the first day of August, 1932, until he has fully complied with the terms of this decree," the sums paid for temporary alimony accruing after August 1, 1932, to be credited on the $3,000 al-

lowed as permanent alimony and the interest thereon. The decree also contains this further provision:

"And the said Edgar L. Simpson having declared his intention to appeal from this decree, it is ordered that the same be suspended except as to the temporary alimony of $25 a week hereinabove provided, for the period of sixty days from the date hereof, upon the said Edgar L. Simpson executing a proper bond before the clerk of this court in the penalty of five hundred dollars."

The decree extinguishes all the marital rights of either party in the property of the other.

Edgar L. Simpson petitioned for an appeal from and supersedeas to the decrees of April 23, and August 1, 1932, and was granted an appeal from both decrees with a supersedeas thereto "except as to so much of the decree of August 1, 1932, as relates to the payment of temporary alimony of $25 per week."

The plaintiff in error makes these four assignments of error:

(1) "The court erred in not granting your petitioner the annulment of the marriage between himself and the defendant on the ground that same was in contravention of section 5113 of the Code of Virginia."

(2) "The court erred in allowing the defendant to file an answer and cross-bill praying for a divorce and alimony *pendente lite*."

(3) "The court erred in granting the defendant a divorce and decreeing to her temporary alimony, permanent alimony, attorney's fees and costs."

(4) "The court erred in refusing to annul the marriage as being in contravention of section 5113 and further erred in not granting your petitioner a divorce from bed and board on the ground of desertion and abandonment."

The decree entered by this court on June 15, 1933, reversed both the decrees appealed from and decreed that the marriage of the appellant and appellee was null and void. Upon a reconsideration of the subject, upon the rehearing, we are of opinion, for the reasons below stated,

that our former decree was wrong; and that the decrees appealed from should have been affirmed.

■ For an orderly consideration of the appellant's assignments of error, it is necessary to consider first the contention which he makes that, by her suit brought to procure a divorce from Greenburg, appellee is estopped from asserting in this suit that Greenburg was dead either at the time she brought her suit or at the time (September 5, 1930) the decree was entered granting her a divorce from him. Upon a re-examination of this question we are of opinion that this contention is not well made. No estoppel to assert in a subsequent proceeding that Greenburg was dead arose either from the bringing of the suit or from the entry of the decree for a divorce.

In her bill for a divorce she expressly states that she does not know whether he is living or dead; and in the light of that allegation it is difficult to see upon what principle she could be held to be estopped from later asserting that he was dead at that time. But apart from this, we are of opinion that the bringing of a suit for a divorce and the entry of a decree for divorce therein does not estop the complainant from asserting in a subsequent suit between the complainant and another person that the defendant was dead at the time the divorce suit was brought. *Hunter* v. *Hunter,* 111 Cal. 261, 43 Pac. 756, 31 L. R. A. 411, 52 Am. St. Rep. 180; *Routledge* v. *Githens,* 118 Or. 70, 245 Pac. 1072, 45 A. L. R. 922, and note p. 925; *Supreme Commandery of Knights of Golden Rule* v. *Everding,* 20 Ohio Cir. Ct. R. 689, 21 Ohio Cir. Ct. R. 429, 11 O. C. D. 419; 9 R. C. L., pp. 461, 462, section 273.

The entry of the decree cannot be taken as an adjudication that Greenburg was alive at the time the decree was entered. All decrees entered against a person upon an order of publication are in a sense provisional. If the person be dead the decree is a nullity. It cannot in any sense be said to be an adjudication that he was alive at that time. The court does not stop to examine into that

question. It provisionally assumes he is alive and proceeds to decree. If he is dead the tacit provision upon which the decree was entered having failed, the decree falls with it.

*Spiltoir* v. *Spiltoir,* 72 N. J. Eq. 50, 64 Atl. 96, was a suit brought by Mrs. Spiltoir for a divorce from her husband, who had been absent from home unheard of for the seven-year period required by the New Jersey statute to raise a presumption of his death. The cause was referred to a master for a report. The master reported that a decree for a divorce should not enter because Mr. Spiltoir was presumed to be dead. The learned chancellor overruled the report of the master and entered a decree for divorce holding: Notwithstanding the presumption that Spiltoir is dead, it is a mere rebuttal presumption which would be rebutted by the proof that he is alive. Should he prove to be alive any marriage she might contract in reliance upon the presumption would be void. (*Glass* v. *Glass,* 114 Mass. 563.) In the absence of proof (other than the presumption of death) that Spiltoir is dead, the court should proceed to enter a decree of divorce, which if he be living will be good against him and the world, and if he be dead will be a mere nullity.

We think this case is sound on principle and establishes the correct procedure in such a case; and that no estoppel of the complainant to assert in another proceeding that the defendant was dead at the time the suit was instituted arises either from the bringing of the suit or the entry of a decree for divorce therein.

██ The appellant relies on *Heflinger* v. *Heflinger,* 136 Va. 289, 118 S. E. 316, 32 A. L. R. 1088, to support the contention made by him under his second assignment that, where a bill is filed to annul a marriage, the defendant should not be allowed to file a cross-bill thereto praying for a divorce. This case does not support this contention. In it the demurrer to the cross-bill was sustained because no good defense was interposed to the bill. Where a bill

is brought to annul a marriage, if an answer pleading a good defense to the bill for annulment be filed, a cross-bill may be filed praying a divorce, if there be grounds for it. *Wadsworth* v. *Wadsworth,* 81 Cal. 182, 22 Pac. 648, 15 Am. St. Rep. 38; *Sodini* v. *Sodini,* 94 Minn. 301, 102 N. W. 861, 110 Am. St. Rep. 371.

The appellant's first assignment of error turns upon the correct construction, or rather interpretation, of section 5113, Code Va. 1919, and section 6239, Code Va. 1919, as amended by Acts 1930, ch. 242, p. 629.

Section 5113 reads:

"On the dissolution of the bond of matrimony for any cause arising subsequent to the date of the marriage, neither party shall be permitted to marry again for six months from the date of such decree, and such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree, or in any prosecution on account thereof, until the expiration of such six months."

We are of opinion that this prohibition has no application where one of the parties is dead when the decree is entered or where one of the parties has died after the entry of the decree.

If one of the parties is dead when the decree is entered, the marriage has been dissolved by death, it cannot be dissolved by the decree of the court, for there is nothing to dissolve. The decree of divorce is a mere nullity.[2]

When the spirit and reason of the statute and the evils which it was intended to remedy are taken into consideration, the prohibition is not properly to be construed as applying after one of the parties has died subsequent to the entry of the decree.

The theory of the statute is that the bond of matrimony

---

[2] See *Craddock's Adm'r* v. *Craddock's Adm'r,* 158 Va. 58, 163 S. E. 387, and *Cumming* v. *Cumming,* 127 Va. 16, 102 S. E. 572, as to for what purposes a suit for divorce may be revived against the personal representative of one of the parties who has died *pendente lite.*

shall not be completely dissolved by the entry of the decree, but only after the lapse of six months from the entry of the decree. Says the statute, the "bonds of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree, or in any prosecution on account thereof, until the expiration of such six months." It is hardly to be assumed that the General Assembly intended to attempt to prevent by its *ipse dixit* the dissolution of the bonds of matrimony by death, or to keep a woman married to a man after he has passed into eternity.

To construe the prohibition as continuing to apply though one of the parties may have died is not in accordance with the spirit, reason or purpose of the statute. The subject with which the General Assembly was dealing was the marital relations of living persons. The object which it manifestly had in view was to remove the temptation to a married man or woman to procure a divorce so that he or she may marry another while his or her spouse is living. Perhaps it was also the purpose of the General Assembly to give the estranged couple an opportunity to reunite and re-establish their disrupted family before either of them had hastily contracted another marriage and made it impossible. There is nothing in the subject matter of the statute which gives any indication of a purpose to prevent husband from marrying again after the death of his wife or *vice versa*. The evils which it was intended to remedy would not be reached by construing it to apply after the death of either party.

"Legislatures, like courts, must be considered as using expressions concerning the thing they have in hand, and it would not be a fair method of interpretation to apply their words to subjects not within their construction, and which if thought of would have been more particularly and carefully disposed of." *Estate of Ticknor*, 13 Mich. 44, quoted with approval in Black on Interp. of Laws, section 30, p. 56.

In his Commentaries, vol. 1, pp. 60-61, Blackstone writes

interestingly upon this subject: "The fairest and most rational method to interpret the will of the legislator, is by exploring his intentions at the time when the law was made by the *signs* the most natural and probable. And these signs are either the words, the context, the subject matter, the effect and consequences, or the spirit and reason of the law. Let us take a short view of them all.

■ "1. Words are generally to be understood in their usual and most known signification; not so much regarding the propriety of grammar, as their general and popular use. Thus the law mentioned by Puffendorf, which forbade a layman to lay hands on a priest, was adjudged to extend to him who had hurt a priest with a weapon." * * *

■ "4. As to the *effects* and *consequences,* the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them. Therefore the Bogolonian law, mentioned by Puffendorf, which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' was held after a long debate not to extend to the surgeon who opened the vein of a person that fell down in the street with a fit."

■ "5. But, lastly, the most universal and effectual way of discovering the true meaning of a law, when the words are dubious, is by considering the *reason* and *spirit* of it; or the cause which moved the legislature to enact it. For when the reason ceases the law itself ought to likewise cease with it. An instance of this is given in a case put by Cicero, or whoever was the author of the treatise inscribed to Herennius. There was a law, that those who in a storm forsook the ship, should forfeit all property therein; and that the ship and lading should belong entirely to those who staid in it. In a dangerous tempest all the mariners forsook the ship, except only one sick passenger, who by reason of his disease was unable to get out and escape. By chance the ship came safely to port. The sick man

kept possession and claimed the benefit of the law. Now here all the learned agree, that the sick man is not within the reason of the law; for the reason of making it was to give encouragement to such as should venture their lives to save the vessel; but this is a merit which he could not pretend to, who neither staid in the ship upon that account, nor contributed anything to its preservation." 1 Bl. Com. pp. 60-61.

In Endlich on the Interpretation of Statutes, at p. 33, the author makes this pithy comment: "But it is another elementary rule, that a thing which is within the letter of a statute is not within the statute unless it be also within the meaning of the legislature, and the words, if sufficiently flexible, must be construed in the sense which, if less correct grammatically, is more in harmony with that meaning. Language is rarely so free from ambiguity as to be incapable of being used in more than one sense; and to adhere rigidly to its literal and primary meaning in all cases would be to miss its real meaning in many. If a literal meaning had been given to the laws which forbade a layman to lay hands on a priest, and punished all who drew blood in the street, the layman who wounded a priest with a weapon would not have fallen within the prohibition, and the surgeon who bled a person in the street to save his life would have been liable to punishment."

Kent in his Commentaries, p. 462, puts it thus: *"Scire legis, non hoc est verba earum tenere sed vim ac potestatem,* and the reason and intention of the law given will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction and absurdity."

In *Offield* v. *Davis,* 100 Va. 250, 257, 40 S. E. 910, 912, the court quotes with approval this language from Suth. on St. Const., section 241:

"In the exposition of a statute, the intention of the lawmaker will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict

letter. When the words are not explicit the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion."

The Virginia court has applied the principle which we are here applying in a number of cases. *Orange & Alexandria R. Co.* v. *City of Alexandria,* 17 Gratt. (58 Va.) 176; *Humphreys* v. *Norfolk,* 25 Gratt. (66 Va.) 97; *Enoch v. Com.,* 141 Va. 411, 126 S. E. 222; *Board of Supervisors* v. *Cox,* 155 Va. 687, 156 S. E. 755; *Indemnity Ins. Co.* v. *Nalls,* 160 Va. 246, 250, 168 S. E. 346; *Falls Church* v. *Board of Sup'rs of Fairfax County,* 151 Va. 672, 682, 144 S. E. 870: *H. L. Carpel Co.* v. *City of Richmond, post,* p. 833, 175 S. E. 316.

In *H. L. Carpel Co.* v. *City of Richmond, post,* p. 833, 175 S. E. 316, decided at this term of this court, this principle is again applied. In that case a city ordinance required every person, "other than a distributor or vendor of motor vehicle fuels and petroleum products, a farmer, a dealer in forest products or manufacturer," who sells and delivers at the same time at other than his definite place of business, to take out a peddler's license. A literal construction of this ordinance would exempt any person who is "a farmer" or a "dealer in forest products" from taking out a peddler's license, no matter what he might be selling. But the court holds that "farmer" as used in that ordinance must be interpreted as being limited to a farmer who is peddling only agricultural products produced by him, and that "dealer in forest products" must be interpreted as being limited to a person peddling only forest products which he himself has produced.

We shall content ourselves with a citation of only two of the many cases from other jurisdictions in which the principle which we are here applying has been applied. ▇ A New Jersey statute made it a misdemeanor for

any person to "wilfully open, break down, injure or destroy any fences, rails or enclosures belonging to or in the possession of any other person," and fixed the punishment for so doing. Clark was indicted under this statute for destroying a fence on a piece of land which was in the possession of another. He defended that the land was his own property which the other person had unlawfully taken possession of. The court held that the statute applied only to such acts as amounted to a trespass, and that Clark's defense was a good defense, saying: "The language of the act, if construed literally, evidently leads to an absurd result. If a literal construction of the words of a statute be absurd, the act must be so construed as to avoid the absurdity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed." *State* v. *Clark,* 29 N. J. L. (5 Dutcher) 96.

A Massachusetts statute gave treble damages against any person who should commit waste on land pending a suit for its recovery. The court held that the act did not apply to a party wholly ignorant that a suit was pending, saying: " * * * we can hardly suppose the legislature intended to punish so severely a trespasser who was wholly ignorant that any suit was pending. * * * The statute is highly penal, and should therefore be limited in its application to the object the legislature had in view." *Reed* v. *Davis,* 8 Pick. (Mass.) 514, 516.

■ If Greenburg was dead at the time of the marriage of the appellant and appellee, the marriage is *not* rendered void by the fact that it took place within six months after the decree of divorce was entered.

Mrs. Simpson's defense to the bill for annulment is that Greenburg was dead at the time of her marriage to Simpson. There is no conclusive proof in the record that Greenburg was dead at that time. All the testimony relating to that issue may be true, and yet Greenburg may be alive. But the evidence is sufficient (both under the

Virginia statute on the subject, and under what has been acepted as common law since about 1805) to raise a presumption not only that he was dead at that time, but that he was dead when the decree purporting to divorce her from him was entered. The Virginia statute on this subject traces back to the act of December 1, 1786 (1 Rev. Code 1819, ch. 97, p. 358) quoted in the footnote.[3]

This statute is an extension of the principles of the provision of the English statutes, 1 James 1, ch. 11, section 1, and the statute 19 Car. 2, ch. 6. When it was enacted it cannot be said that it was in any true sense declaratory of the common law. What has come, since about 1805, to be accepted as a rule of the common law on this subject has been developed from these statutes, instead of the statutes having been declaratory of or a modification of an earlier rule of the common law.[4]

The statute of 1786 remained in effect unchanged even in verbiage until the revision of the Code of 1849, in which it was replaced by sections 41 and 42, ch. 176, Code 1849, p. 669, which were carried unchanged into the Code of

---

[3] "Be it enacted by the General Assembly of Virginia, that any person absenting himself beyond sea, or elsewhere, for seven years successively, *shall* be presumed to be dead, *in any case* wherein his death shall come in question, unless *proof be made* that he was alive within that time. But an estate recovered in any such case, if in a subsequent action, or suit the person presumed to be dead shall be proved to be living, shall be restored to him who shall have been evicted, and he may moreover demand and recover the rents and profits of the estate, during such time as he shall have been deprived thereof with lawful interest." (Italics ours.)

[4] The statute of 1 Jas. 1, ch. 11, section 1, applied only to prosecutions for adultery. It provided that no person should be prosecuted for adultery who married again after his or her husband or wife "shall be continually remaining beyond the seas by the space of seven years together or whose husband or wife shall absent him or herself the one from the other for seven years together, in any parts within his majesty's dominion, the one of them not knowing the other to be living within that time. The statute of 19 Car. 2, ch. 6, extended this principle to cases of absent life tenants.

For a history of the development of what is now accepted as the common-law rule of presumption of death from absence for seven years see Thayer, Prel. Treat. on Ev., p. 319; 1 Jones, Com. on Ev. (2d Ed.) section 285 *et seq.*; 2 Chamberlayne, Mod. Law of Ev. section 1093 *et seq.*

1887 as sections 3373 and 3374, which are quoted in the footnote.[5]

In *Selden's Ex'r* v. *Kennedy* (1906) 104 Va. 826, 52 S. E. 635, 4 L. R. A. (N.S.) 944, 113 Am. St. Rep. 1076, 7 Ann. Cas. 879, the court held that, where in reliance upon the presumption which section 3373, Code 1887, declared shall be indulged, an administrator had been appointed for a person who later appeared in the flesh to claim his property, the grant of the letters of administration was absolutely void *ab initio*. Following this the act of 1908 (Acts 1908, ch. 294, p. 536) relating to the grant of letters of administration and to dealing with property of a person presumed to be dead was enacted to take care, so far as possible, of the situation where the person presumed to be dead proves to be alive.

When the Code of 1919 was enacted what had been section 3373, Code 1887, was carried, without any change whatever, into it as section 6239. But what had been section 3374 was omitted. Apparently the view of the revisors was that its provisions were covered by the provisions of the act of 1908, which were carried into the Code of 1919 as sections 5361-5368. With these last mentioned sections we are not concerned as they relate entirely to administration and distribution of the estate of a person presumed to be dead.

By Acts 1920, ch. 304, p. 421, without changing the language of section 6239, it was amended by adding thereto a new provision seeking to make the presumption of death conclusive after twenty years' absence in so far as it affected property rights.

---

[5] Section 3373. "Presumptions of death from absence.—If any person, who shall have resided in this State, go from, and do not return to the State for seven years successively, he *shall* be presumed to be dead *in any case* wherein his death shall come in question, unless *proof be made* that he was alive within that time." (Italics ours.)

Section 3374. "Rights of persons injured by such presumption, restored.—If the person so presumed to be dead be found to have been living, any person injured by such presumption shall be restored to the rights of which he shall have been deprived by reason of such presumption."

By Acts 1930, ch. 242, p. 629, section 6239 was again amended by striking out the language added in 1920, and adding to the original language of the act the words following the star in the footnote.[6] We are only concerned with the first sentence of section 6239, which is the original part of the statute. The contention of the appellant that the succeeding part of the statute applies to divorce cases is without merit. That part of it manifestly applies only where an order or decree is sought "in favor of the alleged heirs, devisees, or legatees of the supposed decedent or persons claiming by, through or under them."

 This statute prescribed a true rebuttable presumption of law as distinguished from a presumption of fact (which is in reality merely an inference of a fact from facts proven) and from an administrative assumption of fact.[7] A rebuttable presumption of law is a provisional procedural assumption of a fact which is prescribed by a rule of the substantive law. It is a rule of the *substantive* law declaring that for *procedural* purposes a

---

[6] Section 6239, Code 1919, as amended by Acts 1930, ch. 242, p. 629:

"If any person, who shall have resided in this State, either go from and do not return to the State for seven years successively, and be not heard from, or if he shall disappear for seven years successively and be not heard from, he *shall* be presumed to be dead in any case wherein his death shall come in question, *unless proof be made* that he was alive within that time. * But before any final order or decree is entered in any such cause, in favor of the alleged heirs, devisees or legatees of the supposed decedent, or persons claiming by, through or under them, or any of them, proceedings shall be had in conformity with sections fifty-three hundred and sixty-one, fifty-three hundred and sixty-two, fifty-three hundred and sixty-three, fifty-three hundred and sixty-four, and fifty-three hundred and sixty-five of this Code, provided that such person so presumed to be dead, his heirs at law, devisees, next of kin and legatees, may be made parties defendant to proceedings in respect to property, real or personal, in which he may have an undivided interest by order of publication or other process as provided by law and such proceedings whether in the nature of partition, eminent domain or otherwise, shall not be stayed in respect to the division, sale or other disposition of the entire property and the sections of the Code mentioned shall be applicable only to the portion of the property set apart or to the share of the proceeds to which such person would be entitled." (Italics ours.)

[7] On so-called presumptions of fact and administrative assumptions of fact as distinguished from true presumptions of law, see 1 Chamberlayne, Mod. L. of Ev. sec. 1027 *et seq.*

██

certain *prima facie* probative force will and *shall* (until evidence sufficient to prove the contrary is introduced) be *provisionally* attached to a given state of facts; that is, a certain inference *shall* be drawn from it, unless and until evidence sufficient to prove the contrary has been introduced. A party is as much entitled to a benefit of a presumption of law as he would be to have any other appropriate legal rule applied to the facts of his case; and, where the facts which are required to give rise to the presumption are proven, the presumption must be applied (the presumed fact must be assumed to have been proven) until evidence sufficient to overcome the presumption and prove the contrary shall have been introduced. 1 Chamberlayne, Mod. Law of Ev. sections 1085, 1089.

The so-called presumption of the continuance of life is not a presumption of law but an inference, or rather an administrative assumption of fact. 1 Chamberlayne, Mod. L. of Ev., section 1034. Such presumptions give place to true presumptions of law. Whenever the presumption of the death of a person prescribed by the statute here under consideration arises, it overcomes the inference, or the administrative assumption, that he is still alive, if under the conditions shown to exist, it would be reasonable to think he still lived.

It is not necessary here to decide whether the burden rested upon Mrs. Simpson to show that Greenburg was dead when she married Simpson, or upon Mr. Simpson to prove that Greenburg was alive at that time,[8] for Mrs. Simpson had carried the burden. She has proved facts from which the statute declares the court *in any case* in which Greenburg's death is called in question *shall provisionally* assume that he was dead at the time of their marriage unless proof be made that he was alive at some time within seven years prior to the time of their marriage. And no such proof was made.

---

[8] There is much authority for placing the burden on Mr. Simpson.

It necessarily follows that, for all the purposes of this case, it must be assumed as a fact that Greenburg was dead when Mr. and Mrs. Simpson were married.

Our conclusion is that no decree could properly be entered in this cause declaring the Simpsons' marriage void; that the issues relating to a divorce must be determined upon the assumption that the marriage of the appellant and appellee is valid; that the court correctly decreed a divorce to Mrs. Simpson, and refused a divorce to Mr. Simpson; that the court did not err in granting her either temporary alimony and counsel fees; and that the decree of the trial court should be affirmed.

The decree entered by this court in this cause on June 15, 1933, will be set aside, and a decree entered affirming the decrees appealed from.

*Affirmed.*

CAMPBELL, C. J., dissenting:

I am unable to concur in the majority opinion in this case.

In the late spring or early summer of 1930, Mrs. Greenburg brought suit for divorce, the grounds therefor being that her husband had deserted her and had not been heard from since September 2, 1923. She obtained a decree *a vinculo* on September 5, 1930, three days after the presumption of death had become established. It thus appears that before any decree was taken the period from which this presumption arises had passed. Plaintiff then stood upon her election. She might have dismissed or abandoned her suit and acted upon the presumption that her husband was dead; she might have proceeded to prosecute it to a final decree. She chose the latter course.

This presumption of death is a rebuttable presumption, and if relied upon might have led to embarrassing results, for Greenburg might have reappeared and she might have found herself possessed of two husbands instead of one. It was in view of these possibilities that this lady elected to proceed under and to take under the statute.

That statute, in terms, declares that parties divorced shall not remarry within six months. Its language is perfectly plain, and being plain there is no occasion to interpret it. If we were to speculate as to the reasons which led to its enactment, we would probably reach the conclusion that it was to restrain a too hasty journey from the court room to the altar; but whatever may have been the reason the legislature has spoken. It has the power to say that those divorced shall never remarry. In short, it has the power to impose any conditions which in its judgment seem wise.

It is interesting to note that since the opinion in this case was handed down, Code, section 5113, has been amended. The matters dealt with have become matters of public comment in the press and through the law journals of the State. One of counsel in this case was a member of the legislature. And yet, the prohibitions theretofore provided stood unchanged, save in one respect,— those divorced might remarry each other at any time.

In short, my conclusion is that Mrs. Greenburg, when she saw fit to pursue the statutory remedy which she did pursue, took such a divorce as the court had power to give her, and she took it *cum onere*. She did not have to take it, but she elected to take it burdened with the conditions of which she now complains.

If Greenburg were to reappear tomorrow and stand upon his marital rights, can we doubt for a moment that Mrs. Simpson would tell him they were measured by the decree of September 5, 1930? She would tell him that she had never relied upon any presumption but stood upon a court decree which she had with forethought secured to meet this possible emergency.