Vonnie JOHNSON, Appellant,

v.

Mattie YOUNG, Appellee.

Levy S. JOHNSON, Appellant,

v.

Vonnie B. JOHNSON, Appellee.

Nos. 9073, 9776.

District of Columbia Court of Appeals.

Argued April 21, 1976.

Decided April 12, 1977.

Rehearing En Banc Denied May 24, 1977.

Dovey J. Roundtree, Washington, D.C., for Vonnie Johnson.

Samuel Green, Washington, D.C., for Mattie Young and Levy S. Johnson.

Before KELLY, GALLAGHER and MACK, Associate Judges.

KELLY, Associate Judge:

These consolidated appeals are from contradictory rulings in two closely related cases in which the crucial issue was whether a valid marriage exists between cross-appellants Levy and Vonnie Johnson.[1] In separate proceedings in the trial court, different trial judges reached opposite conclusions on this question.

On March 9, 1933, Alma [also known as Elma, Eleanor, or Jean] Lee Berkley obtained a divorce in the State of Virginia from her husband, John Berkley. The divorce decree provided that neither could marry again until six months had elapsed. Nevertheless, on March 25, 1933, sixteen days later, Alma and Levy Sylvester Johnson were ceremonially married in Hanover County, Virginia.

It is not clear precisely when the following events took place, but the couple apparently resided in Virginia for approximately three years and then moved to Washington, D.C., where they remained, more or less together, until their permanent separation in 1940.[2] It is acknowledged that sometime between 1936 and 1940, Levy Johnson met Vonnie Williams and began spending nights with her on a fairly regular basis even to the point of moving some of his clothes into her apartment. While the testimony is conflicting as to how much time he actually spent with Vonnie, he apparently continued to also visit Alma, at least during the day. Vonnie began calling herself "Mrs. Johnson" shortly after their relationship began.

At some uncertain time Vonnie discovered that Levy had been married to Alma and when she became pregnant with his child in 1940, she wrote to an attorney in Richmond, Virginia, to ascertain whether Levy was free to marry her. The attorney wrote back to say that Levy was indeed free to marry because his marriage to Alma within the forbidden six months following her divorce was void and Virginia does not recognize common-law marriage. Relying on this information, Levy and Vonnie were ceremonially married in Upper Marlboro, Maryland, on March 6, 1941.

Two children were born of this marriage, and Levy and Vonnie lived together for the next thirty years until the summer of 1972. Levy then left Vonnie and soon after moved in with Mrs. Mattie Young, who now refers to herself as Mattie Johnson.

On February 9, 1973, Vonnie filed a complaint for support in the Superior Court of the District of Columbia. Levy admitted the marriage and consented to an order to pay Vonnie $25 weekly for her support. On June 7, 1974, Vonnie filed a suit against Mattie Young for damages based on a claim of alienation of affections. In this latter action the trial court found that Vonnie was not validly married to Levy because of his prior common-law marriage to Alma and thus could not maintain an action for alienation of his affections. Vonnie appeals from that order.

On December 9, 1974, Levy filed in the support action a motion to terminate support payments on the ground that he had never been married to Vonnie. On the same date he filed a complaint for divorce from Alma, long since remarried and living in New York. The divorce action pends but, on June 11, 1975, the trial court denied the motion to terminate support. Levy appeals this order which was based on a finding that he is validly married to Vonnie.

1. As nearly all the persons referred to claim the surname Johnson, for the sake of simplicity we refer to them by their first names.

2. Neither Alma nor Levy filed for a divorce until December 9, 1974, after the decision in the suit for alienation of affections. Levy never contributed to Alma's support and, in fact, they were out of touch with one another until 1970.

## I.

■ A legal presumption exists in the District of Columbia that where there is more than one marriage the most recent is valid. *Mayo v. Ford,* D.C.Mun.App., 184 A.2d 38 (1962). While the presumption is not conclusive, it is one of the strongest in the law, and it is settled that the party attacking the second marriage has the burden of rebutting the presumption by strong, distinct, satisfactory, and conclusive evidence. *Patterson v. Gaines,* 47 U.S. (6 How.) 550, 596, 12 L.Ed. 553 (1848); *Mayo v. Ford, supra; United States v. Warner,* 84 F.Supp. 607 (D.D.C.1949), *aff'd sub nom. Harsley v. United States,* 88 U.S.App.D.C. 150, 187 F.2d 213 (1951).

Applying these general principles to the facts before us, it is clear that the marriage between Vonnie and Levy is entitled to a presumption of validity and Levy's counsel concedes as much in his brief. It is also clear that it is Levy who has the burden of proving this marriage invalid by "strong, distinct, satisfactory, and conclusive" evidence. *Mayo v. Ford, supra* at 41. Since Levy's ultimate position in both cases [3] was that his marriage to Vonnie was void because he married her while still legally married to Alma, the issue is whether Levy and Alma were ever legally married.

■ The ceremonial marriage of Alma and Levy was void because it was performed within the proscribed period after Alma's divorce from John Berkley [4] in a state which does not recognize common-law marriages. Va. Code 1919, § 5071; *Bell v. Tug Shrike,* 332 F.2d 330 (4th Cir.), *cert. denied,* 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964); *National Union Fire Ins. Co. v. Britton,* 187 F.Supp. 359 (D.C.1960), *aff'd,* 110 U.S.App.D.C. 77, 289 F.2d 454, *cert. denied,* 368 U.S. 832, 82 S.Ct. 54, 7 L.Ed.2d 34 (1961). On the other hand, the District of Columbia does recognize such marriages; *McCoy v. District of Columbia,* D.C.App.,

256 A.2d 908 (1969); *Lee v. Lee,* D.C.App., 201 A.2d 873 (1964); and because there is evidence that Levy and Alma cohabited in the District, it is possible that their relationship became a valid common-law marriage once they entered the District of Columbia.

■■ To establish a common-law marriage in the District of Columbia there must be an express mutual present intent to be husband and wife, followed by good faith cohabitation. *McCoy v. District of Columbia, supra ; United States Fidelity & Guaranty Co. v. Britton,* 106 U.S.App.D.C. 58, 61, 269 F.2d 249, 252 (1959). Levy's burden of proof was, therefore, to show by clear and convincing evidence that his relationship with Alma during the period from 1936 to 1940 met these requirements. Upon examination of the record on appeal,[5] we agree the trial court could find that Levy did not fulfill this heavy burden. The evidence was at best contradictory. In the support action, where the issue was fully aired, Vonnie testified that she had met Levy in 1936, that they became intimate shortly thereafter, that Levy stayed at her apartment three or four nights a week, and that she could have called herself Levy's wife at any time after 1937. An insurance policy dated August 8, 1938, was admitted showing Vonnie Johnson as the insured and Levy Johnson as the beneficiary, as was a notice of January 8, 1939 to employees from GSI, Vonnie's employer, addressed to Vonnie Johnson. Levy himself, while first testifying that he met Vonnie in 1940, later stated that he met her before that time and he may have begun living with her in 1937 or 1938. Levy also testified that he had obtained a job at GSI through Vonnie's brother sometime in 1937. He also admitted to lying about his marital status on income tax forms.

Depositions of Alma and of Irene Washington, with whom Levy and Alma suppos-

**3.** Levy was not, of course, a party in the alienation of affections suit. He was called as a witness by Vonnie.

**4.** Va.Code 1919, § 5113; *Simpson v. Simpson,* 162 Va. 621, 175 S.E. 320 (1934).

**5.** It is conceded by all parties that the ruling in the alienation suit was not binding on the trial judge in the support action.

edly had lived from 1936 to 1938, revealed that Alma was vague about how long she had lived anywhere, and. that she at one point admitted that it could have been as early as 1934 when Levy left her. She did say that she had never sought a divorce or annulment from Levy, but had in fact married one Eddy Brooks in New York from whom she was now separated. Mrs. Washington, also unclear as to exact dates, testified that Alma had lived with her sister until 1938, and that while Levy paid the rent, she was not sure where he spent his nights.

On this record it cannot be said that the trial court's findings are legally erroneous. The court's function was to evaluate the evidence and the credibility of the parties and witnesses, and clearly the testimony is such that the court could find that they failed to prove by clear and convincing evidence that there was a common-law marriage between Levy and Alma from 1936 to 1940.[6]

## II.

█ The alienation of affections trial was conducted by the court sitting without a jury. There was no suggestion in the pleadings that Vonnie did not have standing to maintain such a cause of action because she was not married to Levy. Defense counsel, who in this case was representing Mattie, told the trial judge that he had only learned from Levy on the preceding Monday night [trial commenced Wednesday morning] that Levy had been previously married to Alma Lee. Vonnie's counsel had no notice of this possible defense to the alienation claim until she had virtually finished presenting her case. As a consequence, counsel had not addressed herself to the issue of the validity of the Vonnie/Levy marriage, but instead had attempted to establish the elements of a prima facie case of alienation of affections. For this purpose, Levy himself was called as

a witness. It was only on cross-examination that the possibility of a prior common-law marriage between Levy and Alma was first raised. Levy asserted its existence, and obviously his testimony was uncontroverted. Given an opportunity to persuade the judge that under the law, the Vonnie/Levy marriage was entitled to a presumption of validity and that the existence of a prior common-law marriage must be shown by clear and convincing evidence. *Mayo v. Ford, supra,* counsel vigorously argued that Levy's self-serving testimony, the only evidence of such a marriage offered, was insufficient to meet this burden. Levy's counsel, on the other hand, argued that once a defense of prior marriage has been raised the burden shifts to the proponent of the later marriage to prove its existence. The trial judge agreed and ruled that the burden of proof was on Vonnie. As she had offered no evidence contradicting Levy's testimony, the court ruled that this burden had not been met and since Vonnie could not prove she was Levy's wife, she could not maintain a cause of action for alienation of affections. We conclude for the reasons already discussed that this was error, and consequently, the judgment in this case must be reversed.

## III.

The legal complexities presented by these appeals lead us to question, once again, whether common-law marriages, which are invalid in our neighboring jurisdictions, should still be recognized in the District of Columbia, for

[S]uch a status is the product of an antiquated law and inattention to whether there is a need for a change. .   .   .

We commend to the attention of [the Legislature] the question whether such an informal and almost uniformly misunderstood status should not be abolished to end creation of such relationships in the

---

**6.** Because we affirm on this ground we need not consider the court's holding that under these facts Levy is estopped from asserting the existence of a prior common-law marriage or its holding that even if Levy had presented

conclusive evidence of a prior common-law marriage, such evidence would be insufficient as a matter of law to invalidate a subsequent marriage performed pursuant to statute.

future. The considerations which history teaches gave rise to judicial recognition of such informal and unrecorded marital agreements can hardly justify modern day perpetuation. Cost is certainly not prohibitory, and a plethora of public and quasi-public officials are available to solemnize such an important and socially significant occasion. Certainly no one would contend that facilities for recordation are unavailable. Indeed, one might question whether any valid reason exists to encourage and sanction future circumvention of the established and salutary system for formalizing and recording marriages. [*McCoy v. District of Columbia, supra* at 910 (footnotes omitted.)]

*The judgment on appeal in No. 9776 is affirmed. The judgment on appeal in No. 9073 is reversed and remanded for a new trial.*