**Julia C. JACKSON, Plaintiff,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 87–3453.**

United States District Court, District of Columbia.

July 25, 1988.

Peter J. Kadiz, Washington, D.C., for plaintiff.

Susan Nellor, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to appeal the decision of an Administrative Law Judge (ALJ) of the Social Security Administration which denied her application for widow's insurance benefits. She had applied for the benefits under 42 U.S.C. § 402(e) as the common-law wife of Ernest B. Jackson.[1] The case is now before the Court on plaintiff's motion for summary judgment, and on defendant's motion for summary affirmance. After carefully considering the motions, the opposition to them, and the administrative record,[2] the Court concludes that plaintiff's motion should be granted, and that the ALJ's decision should be reversed.

## I. APPLICABLE LAW

In determining whether a common-law marriage existed, an ALJ is to apply the laws of the state where the insured had a permanent home when he or she died. 20 C.F.R. § 404.345 (1987). There is no question here that District of Columbia law applies, or that the District of Columbia recognizes common-law marriages. To establish a common-law marriage in the District of Columbia there must be an express mutual present intent to be husband and wife, followed by good faith cohabitation. *Johnson v. Young,* 372 A.2d 992, 994 (D.C. 1977). The party seeking to establish such a relationship must do so by clear and convincing evidence. *Id.*

A common-law marriage requires more than mere cohabitation and adoption of the "husband's" surname. *McCoy v. District of Columbia,* 256 A.2d 908, 910 (D.C.1969). Mutual consent to be married is essential, and a couple's expressions to each other that they are husband and wife can constitute such an agreement. *See National*

*Union Fire Insurance Co. v. Britton,* 187 F.Supp. 359, 363–4 (D.D.C.1960). Evidence of a couple's general reputation in the community as being married or unmarried is also important. *See Troshinsky v. Rosin,* 428 A.2d 847, 849 (D.C.1981). The existence of an agreement to be married may be inferred from the character and duration of cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship. *Marcus v. Director, Office of Worker's Compensation Program,* 548 F.2d 1044, 1048 n. 9 (D.C.Cir.1976). An inference of common-law marriage may be rebutted by direct evidence that there was no present agreement. *Id.* If at least one of the parties to the alleged marriage is available as a witness, cohabitation and reputation are insufficient to create an inference of common-law marriage in the absence of the party's assertion of consent or agreement. *United States Fidelity & Guaranty Co. v. Britton,* 269 F.2d 249, 252 (D.C.Cir.1959).

Under the regulations of the Department of Health and Human Services, preferred evidence of common-law marriage includes the signed statements of a surviving "spouse" and those of two blood relatives of the deceased "spouse". 20 C.F.R. § 404.726(b)(2) (1987).

In this case, after hearing plaintiff's testimony and reviewing other evidence, the ALJ concluded that "despite their prolonged cohabitation, the wage earner and claimant never entered into a present mutual agreement to become husband and wife, and without such agreement their cohabitation cannot rise to the status of a common-law marriage under the laws of the District of Columbia." (R. 10).

## II. PLAINTIFF'S EVIDENCE

Plaintiff submitted a variety of evidence to support her assertion of a common-law marriage. First, she testified that Mr.

---

1. Plaintiff is represented by counsel in this action. In the administrative proceeding she was represented by a legal assistant from the Neighborhood Legal Services Program.

2. The administrative record will be cited as "(R. _)."

Jackson moved in with her sometime around August 1969 (R. 25.), and she stated that they lived together until he was placed in a Veterans Administration hospital where he died on August 30, 1980 (R. 35.). She testified that Mr. Jackson proposed marriage to her and asked her to take his name, and that she "considered him to be my husband. And I his wife." (R. 25, 26, 29.) Plaintiff also testified that Mr. Jackson gave her an engagement ring in August 1969 and a wedding ring in November 1969, and that the couple intended to delay a ceremonial marriage until her grandson and his daughter got older, but that they never got around to doing so. (R. 25, 26, 28, 29.) She testified that they referred to each other and were known throughout their community as husband and wife. (R. 26, 27.) Furthermore, she testified that the couple planned to grow old together, and that they shared a common bond of fidelity throughout the eleven years of their relationship. (R. 28.)

Plaintiff also submitted the sworn affidavits of Mr. Jackson's relatives. Elizabeth Brantley, his aunt, Virginia Craig, his sister, and Parniece Jackson–Knox, his daughter, all stated that plaintiff and Mr. Jackson considered and referred to each other as husband and wife, and that they were held out and known as such to their families, friends, and neighbors.[3] (R. 91, 93, 95.) The record also reflects that Ollie Hicks, Mr. Jackson's sister-in-law, sent a card to plaintiff addressed to "Mrs. Julia Jackson". (R. 27, 28, 90.)

Additionally, plaintiff submitted copies of tax returns which indicate that the couple filed at least two returns under the status of "married filing joint return" (1977 federal and 1977 District of Columbia), and that plaintiff filed at least one return under the status of "married filing separate return" (1978 federal). (R. 74, 76, 78.) Plaintiff was also issued a social security card in the name of "Julia H. Jackson". (R. 80.)

### III. THE ALJ'S EVALUATION OF THE EVIDENCE

In concluding that the plaintiff's and Mr. Jackson's eleven year relationship was merely "meretricious" cohabitation, the ALJ found several items of evidence to be persuasive.

First, the ALJ pointed to plaintiff's responses to questions 6A and 6B on the "Statement of Marital Relationship" filed by plaintiff on March 31, 1986 in support of her application for benefits. (R. 9, 10, 52.) In response to the question, "DID YOU HAVE AN UNDERSTANDING AS TO YOUR RELATIONSHIP WHEN YOU BEGAN LIVING TOGETHER?" plaintiff checked the box marked "YES". (R. 52.) In response to the follow-up question, "what did you say to each other about living together?" plaintiff stated that "[w]e had planned to get married, however I was not ready at the time. I wasn't sure if I really wanted to marry him." *Id.* Plaintiff responded "NO" to the further follow-up question, "WAS THIS UNDERSTANDING LATER CHANGED?" *Id.*

Second, the ALJ found it persuasive that the joint savings account held by plaintiff and Mr. Jackson was listed in the names of "Ernest B. Jackson or Julia H. Carelock". (R. 10).

Third, the ALJ found it "noteworthy that claimant did not even use the wage earner's surname when she completed or signed her application for widow's benefits...." (R. 10.)

Fourth, the ALJ pointed to evidence that in April 1980, Mr. Jackson had filed a claim for widower's benefits upon the earnings record of his former wife, Bessie Jackson.[4] (R. 10, 60.) Although the application is not part of the record, a report filed by a social security representative states that Mr. Jackson's benefits record shows that he filed the claim, and that "[t]his clearly shows d[eceased] w[age] e[arner] listed himself as divorced (and not remarried)...." (R. 60.)

---

3. The Agency also obtained statements from Ms. Brantley and Ms. Craig to the effect that the couple lived as husband and wife and was known as such. (R. 57–59.)

4. The record indicates that Bessie Berth Jackson died on August 15, 1968. (R. 94.)

Fifth, the ALJ found Mr. Jackson's death certificate to be persuasive evidence against a common-law marriage since it listed him as "widowed". (R. 10, 97.) The death certificate lists the "informant" as "VA Medical Records ". (R. 97.) The ALJ inferred that this information came from Mr. Jackson. (R. 10.)

Finally, the ALJ found it most persuasive that fairly shortly before his death, Mr. Jackson sent an Easter card to plaintiff from the hospital which was addressed to "Julia Carelock", and which expressed a sentiment "For a Special Friend of Mine".[5] (R. 10, 84–86.)

The ALJ also addressed and expressly discounted some of the evidence submitted by plaintiff. (R. 10.) He stated that "[t]he affidavit of the wage earner's daughter is not persuasive," because, "[a]lthough she stated she considered the wage earner and claimant to be husband and wife, she also conceded that on two prior applications for lump-sum death payment she did not recognize claimant as her father's present spouse and her explanation for this contained in the affidavit is not considered credible." *Id.* The daughter explained that she had indicated on the application that her father's last marriage was to Bessie Jackson because no ceremonial marriage took place between Mr. Jackson and plaintiff, and because Maryland does not recognize common-law marriage. (R. 95–96.) The ALJ found her explanation unpersuasive. (R. 10.) He also determined that the credibility of plaintiff's and Mr. Jackson's 1977 federal tax form as evidence of a common-law marriage is "questionable", because her copy "demonstrates an alteration of her surname." *Id.* He also noted that plaintiff's 1978 W–2 form lists her surname as "Carelock". *Id.*

## IV. STANDARD OF REVIEW

Review of the ALJ's decision is confined to determining whether it is supported by substantial evidence in the record. 42 U.S. C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a con-

clusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Review under this standard calls for careful scrutiny of the entire record. *Brown v. Bowen,* 794 F.2d 703, 705 (D.C.Cir.1986); *Cunningham v. Heckler,* 764 F.2d 911 (D.C.Cir.1985). The reviewing court "may not function as a de novo fact-finding tribunal, nor weigh the evidence and substitute its independent judgment." *Marcus,* 548 F.2d 1051; *see also Davis v. Heckler,* 566 F.Supp. 1193, 1195 (D.D.C.1983). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an ALJ's finding from being upheld. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1020, 16 L.Ed.2d 131 (1966). If, however, "reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary." *Thomas v. Celebreeze,* 331 F.2d 541, 543 (4th Cir.1964). *See also Narrol v. Heckler,* 727 F.2d 1303, 1306–07 (D.C.Cir.1984) (ALJ deciding disability claim erred in relying exclusively upon testimony of one doctor while ignoring contradictory testimony of two other doctors). The substantiality of the evidence relied upon must be viewed in light of any contradictory evidence in the record which detracts from its weight. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). *See also Aircraft Owners and Pilots Ass'n v. F.A.A.,* 600 F.2d 965, 970 (D.C.Cir.1979).

## V. DISCUSSION

A review of the administrative record leaves no question that plaintiff submitted evidence sufficient to prove the existence of a common-law marriage between herself and Mr. Jackson under the law of the District of Columbia. Both her testimony and the statements of Mr. Jackson's relatives are evidence that the couple lived together for eleven years, considered each other to be husband and wife, and held themselves out as such in their community. Under the

---

**5.** The sentiment was printed on the card by the manufacturer; not by Mr. Jackson.

Agency's regulations, this type of evidence is preferred. 20 C.F.R. § 404.726(b)(2) (1987). As is discussed above, plaintiff also submitted several other items of evidence which supported her claim. The tax returns filed under a "married" filing status are most noteworthy.

This, of course, does not end the Court's inquiry, for if there is contradictory evidence in the record, a court must not merely reweigh the evidence and substitute its judgment for the ALJ's. On the other hand, just because there is some evidence in the record weighing in favor of the ALJ's conclusion, a reviewing court is not bound to ignore the other evidence or to give weight to evidence which the ALJ relied upon which does not support his or her conclusion.

The ALJ appears to have placed much weight on plaintiff's statement that at the time that she and Mr. Jackson started living together, they planned to get married, but at that time she was not ready to get married, and she was not sure if she wanted to marry him. (R. 9, 10.) Although plaintiff's testimony explains that she was referring to a future ceremonial marriage, the ALJ did not discuss whether that explanation was reasonable. He merely assumed that the couple's plans to marry in the future referred to any type of marriage.

Plaintiff's statement does indicate that when the couple first started living together, she had doubts about any marriage at all. Even so, that certainly does not preclude the formation of a common-law marriage at some other time during the eleven years that the couple lived together. Nor is an agreement or intent to enter into a ceremonial marriage in the future inconsistent with the existence of a valid common-law marriage. *Marcus,* 548 F.2d at 1048 n. 12.

Furthermore, plaintiff's statement that the couple's understanding regarding their relationship did not change clearly referred to their plans for a ceremonial marriage, and not to her initial uncertainty about marrying Mr. Jackson. (*See* R. 52.) Not only does plaintiff's testimony bear this out, (*see* R. 26, 28–9.), but the record simply does not support an interpretation that plaintiff never abandoned her doubts about being married to Mr. Jackson. Plaintiff's uncontradicted statements were that although they never followed through on their plans for a ceremonial marriage, the couple lived together as husband and wife. (R. 26, 28–9, 52, 53.)

The ALJ also found it significant that the joint savings account which the couple opened in September of 1969, shortly after they began living together, was not listed in the name of "Julia Jackson". (R. 10.) The fact that plaintiff had not taken Mr. Jackson's name immediately after they began living together hardly proves that the couple never formed an intent to be married. Other evidence shows that they formed the intent at a later time. For instance, the evidence shows that Mr. Jackson did not give plaintiff the wedding ring until November of 1969. (R. 25.) [6]

Nor is it particulary noteworthy that plaintiff filed for benefits in this case under the name "Carelock". She testified that she used that name prior to her relationship with Mr. Jackson, because Carelock was the surname of the man who fathered two of her children. (R. 23–24.) Upon Mr. Jackson's death, she chose to return to the name which her children bore. Perhaps, the use of this name on plaintiff's application shows a bit of naivete on her part as to how to put her application in the best light, but it does not say much, if anything, about the nature of her relationship with Mr. Jackson.

The ALJ also relied upon evidence which tended to show that Mr. Jackson did not consider himself to be married to plaintiff. This consisted of Mr. Jackson's application for widower's benefits upon the earnings

---

**6.** In any case, a common-law wife's use of different names at different times is not particularly surprising in view of both the possible confu-

sion over a couple's legal status, and the common practice among many married couples of keeping separate surnames.

record of his deceased wife, and his death certificate. While these items amount to some evidence in support of the ALJ's decision, they are hardly conclusive.

First of all, the application for widower's benefits is not even part of the record, so neither the ALJ nor this Court can tell exactly what statements are made on the application, or to what extent the social security representative's characterization of it consists of factual descriptions or of inferences. Even if the application expressly stated that Mr. Jackson had not remarried, we do not have the benefit of inquiry into Mr. Jackson's motives for this response. For instance, Mr. Jackson might have filed the application upon the belief that he was eligible for benefits because he had not entered into a ceremonial marriage with plaintiff. The point here is not that the ALJ erred in accepting the social security representative's statement as evidence against the existence of a common-law marriage, but that there are limits to the use of this evidence to support his decision. *See, e.g., Morgan v. Richardson,* 325 F.Supp. 128, 129 (N.D.Ala.1971).[7]

The death certificate presents similar problems, in that it is purportedly based upon another source, Mr. Jackson's medical records from the Veterans Administration. While the ALJ could presume that Mr. Jackson supplied the information in the records, there is no way of knowing whether Mr. Jackson listed himself as widowed because he did not consider plaintiff to be his wife, or because he had not entered into a ceremonial marriage with her.

Finally, the ALJ found the Easter card from Mr. Jackson to plaintiff to be a most persuasive piece of evidence in support of his conclusion, because it was addressed to "Julia Carelock" and it stated that it was "For a Special Friend."[8] As plaintiff points out, however, "[w]e can only guess at the selection of Easter cards available at Mr. Jackson's hospital, and whether Mr. Jackson, by then confined to his bed with cancer of the lung, selected the card sent on his behalf." Plaintiff's Memorandum, filed May 9, 1988, at 13. Furthermore, the notion that a wife cannot also be a special friend seems to ignore one of the fundamental elements of a successful marriage, whether ceremonial or common-law. Even if Mr. Jackson did select the card, the sentiment which it expresses on the inside is one which could very well be expected to be found in a card specifically addressed to a spouse, and it might have been the most appropriate expression of Mr. Jackson's feelings for plaintiff.[9] This card appears to be one of the least substantial items of evidence relied upon by the ALJ.

In reviewing the record as a whole, the Court must also examine how or whether the ALJ dealt with evidence which supported the applicant.

The ALJ concluded that the evidence against the existence of a common-law marriage "clearly outweighs the statements obtained from individuals to whom the Administration was directed by claimant." (R. 10.) However, although he may have had a valid reason for discounting the statement of Parniece Jackson–Knox, Mr. Jackson's daughter,[10] the ALJ stated no reason to discredit the statements and affidavits of Mr. Jackson's aunt and sister, and he did not do so. Instead, he ignored them. Given the preferred nature of this evidence under the Agency's regulations, the ALJ's failure to address it other than by acknowledging its existence is a glaring omission.

---

7. *Morgan v. Richardson,* 325 F.Supp. 128 (N.D. Ala.1971), was another case involving a claim for widow's benefits where the alleged husband had responded "no" to the question, "Are you married?" on an application for benefits. Nonetheless, in light of the possibility of error or a misunderstanding regarding the question, and in light of the evidence showing that there was a common-law marriage, the court reversed the agency's finding of no such marriage.

8. On the other hand, the ALJ gave no weight to the letter sent to plaintiff by Mr. Jackson's sister-in-law, Ollie Hicks, which was addressed to "Mrs. Julia Jackson".

9. The card expresses the sender's feeling that no one has ever been more cheerful, thoughtful, or fun to know than the recipient. (R. 86.)

10. *See, supra,* at 60.

Citing 20 C.F.R. § 404.708(e),[11] the ALJ also questioned the credibility of plaintiff's and Mr. Jackson's 1977 federal tax form because plaintiff's surname was "altered". The ALJ, however, found nothing that indicated that the surname was changed for the purposes of plaintiff's application, and clearly, plaintiff made no attempt to hide the change on the return. Despite his apparent doubts as to the credibility of the 1977 federal return, the ALJ did not question plaintiff about that return or any of the others. *See* 20 C.F.R. § 404.929 (1987) (ALJ may ask applicant questions). Even if the credibility of the 1977 federal return could be deemed questionable evidence of a common-law marriage, the ALJ stated no basis to discredit the two other tax returns that plaintiff submitted which were also filed under a "married" filing status. The federal returns were filed under penalties of perjury, and any falsehood on them subjected plaintiff to a $10,000 fine and one year in prison. 26 U.S.C. § 7207. There is no indication that the ALJ took this into account in determining whether the returns were convincing evidence. *See* 20 C.F.R. § 404.708(c).[12]

After reviewing the record as a whole, the Court cannot conclude that the ALJ's decision was supported by substantial evidence. In light of the overwhelming evidence, much of it uncontradicted, that plaintiff and Mr. Jackson considered each other to be husband and wife and held themselves out as such, the contradictory evidence relied upon by the ALJ cannot be deemed substantial. There was uncontradicted evidence in the form of testimony, affidavits, and statements that the couple began living together when plaintiff was 45 years old and Mr. Jackson was 49 years old, and that they lived together and remained faithful to each other for an uninterrupted period of eleven years, until Mr. Jackson was hospitalized with a terminal illness. Nothing indicates that their relationship was not permanent. It does not appear that the ALJ gave any weight to the uncontradicted evidence that the couple expressed a mutual intent to be married by referring to and introducing each other as husband and wife, and that their reputation in their community was as husband and wife. This evidence was mentioned in the opinion, but virtually disregarded when the evidence was weighed.

This is not a case where there is substantial, but contradictory evidence on each side of an issue. The evidence upon which the ALJ relied is inconclusive, and when looked at in the context of the entire record, it is insufficient to support the decision that plaintiff and Mr. Jackson did not have a common-law marriage.

## VI. CONCLUSION

In view of the above, the Court concludes that the ALJ's decision that plaintiff was not the common-law wife of Mr. Jackson should be reversed. Therefore, plaintiff's motion for summary judgment will be granted, and defendant's motion for judgment of affirmance will be denied. Plaintiff is entitled to obtain widow's benefits and this case will be remanded to the Agency for the entry of appropriate relief. A separate order has been issued consistent with this Memorandum.

---

**11.** This regulation provides in part that in deciding if evidence is convincing, the Agency considers whether the evidence has been altered.

**12.** This regulation provides in part that in deciding whether evidence is convincing, the Agency considers whether the information was given under oath, or with knowledge of a penalty for giving false information.