Leon **CUNNINGHAM**, Appellant,

v.

Margaret M. **HECKLER**, Secretary of Health and Human Services.

No. 84–5755.

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1985.

Decided June 21, 1985.

Joseph Chodes, for appellant.

James N. Owens, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before EDWARDS and GINSBURG, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

We here review the decision of the District Court that an Administrative Law Judge (ALJ) properly found the appellant no longer disabled within the meaning of the Social Security Act after February 24, 1982. We reverse for lack of substantial evidence supporting the ALJ's decision, and we instruct the District Court to remand the case to the agency for proceedings consistent with this opinion.

A number of relevant facts are undisputed. Appellant Leon Cunningham is a 49-year-old male with arthritic and other difficulties in his arms that make it impossible for him to work as a carpenter, his occupation for the last two decades. On or about January 10, 1981, the appellant suffered a stroke that immediately disabled him for purposes of the Social Security Act. The critical issue in this case is the duration of the appellant's disability.

■ The appellant has a high-school education. On achievement tests administered after the stroke, Mr. Cunningham scored at the third- to sixth-grade level. His relevant Intelligence Quotient (IQ) is 70,[1] a single point above that which would by itself be likely to qualify him as disabled.[2] Appellant has been hospitalized for alcoholism and arrested for driving while intoxicated, although there is no indication that the appellant is currently suffering from alcoholism.

The procedural history of this case can be briefly recounted. When the appellant first applied for disability payments, the ALJ examined the medical evidence and consulted the "grid" regulations of the Social Security Administration (SSA).[3] The

1. When more than one IQ rating is customarily derived from the same test, as is the case here, the lowest of the ratings produced is the relevant rating. See 20 C.F.R., Appendix 1—Listing of Impairments 12.00 B 4, app. to Subpart P, at 295, 315 (1984) [hereinafter cited as "Listing of Impairments"]. The appellant's IQs range between 70 and 82 on the various measures of the test that he took. Record on Appeal [hereinafter cited as "R."] 158. The score of 70 is therefore the relevant score.

2. An IQ of 60 to 69, when combined with another "impairment imposing additional and significant work-related limitation of function," is one of the definitions of the impairment of mental retardation. Listing of Impairments 12.05 C, supra note 1, at 316. (The appellant's difficulties with his arms seem quite likely to impose a significant work-related limitation of function, especially since no one suggests that the appellant can return to his former job.) Impairment as mentally retarded under the above definition automatically qualifies the applicant as disabled. See 20 C.F.R. § 404.1520(d) (1984).

3. The "grid" regulations are found at 20 C.F.R., Appendix 2—Medical-Vocational Guidelines, app. to subpart P, at 328 [hereinafter cited as "Medical-Vocational Guidelines"]. See also Heckler v. Campbell, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (upholding grid regulations).

ALJ ruled that the appellant had been disabled after his stroke until February 24, 1982, when the disability ceased. Opinion of ALJ at 9, Record on Appeal 33 [hereinafter cited as "R."]. The Appeals Council of the SSA remanded the case to the ALJ for further proceedings on the cessation of disability, because "absent the testimony of a vocational expert, the record does not substantially support the administrative law judge's finding that the claimant could engage in a wide range of sedentary and light work as of February 24, 1982." Order of Appeals Council at 2, R. 20. The ALJ then took testimony from two vocational experts and reached the same conclusion as before. The District Court af-

firmed the decision as supported by substantial evidence.

■ We have examined the record to determine whether the ALJ considered "all the relevant facts" in making his decision.[4] In light of the Appeals Council's decision, the testimony of the vocational experts in this case is especially important. Dr. Richard Lawrence appeared at the request of the ALJ and Dr. James Kuhagen testified at the request of the appellant's counsel. Their qualifications as vocational experts are undisputed.[5]

Dr. Lawrence specified five jobs available to the appellant in significant numbers in the local economy:[6] uniform supply

4. The SSA's regulations provide:
 [W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, in those combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this Appendix 2, full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.
 Medical-Vocational Guidelines, *supra* note 3, § 200.00(e)(2), at 329. The appellant has both strength limitations, e.g., his difficulties with his arms, and nonexertional limitations, e.g., his borderline IQ. A finding that such an individual is not disabled therefore requires consideration of "all of the relevant facts in the case." Cf. *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir.1985) (requiring consideration of all relevant facts where non-exertional impairment involved).
 The ALJ's decision was based on "medical and vocational evidence" and on "using [the grid] as a guide." Opinion of ALJ at 6, R. 13. Use of the grid as a "guide" seems to us equivalent to the use of the grid as a "framework" authorized by the SSA regulation quoted above. We consider below whether the ALJ took into account all of the relevant facts of the case.

5. The transcript, which we reproduce exactly below and throughout the rest of the opinion, reveals the qualifications of the two men as follows:
 ALJ: Dr. Lawrence would you describe your qualification for the record please.
 A I have a master license as a doctor in counseling and I have worked in rehabilitation centers (INAUDIBLE) as a rehabilitation counselor and rehabitation counselor educator and presently I am super field training supervisor for graduate students at the University of Maryland. I teach (INAUDIBLE).
 Transcript of Hearing of October 3, 1983 at 4 [hereinafter cited as "Tr."], R. 47.
 Q ... Your name is James Kuhagen, you're the one who completed the evaluation on March 18?
 A That's correct.
 Q Thank you. Your qualifications in the (INAUDIBLE) would the court like too.
 ALJ: No that's fine.
 Tr. at 22–23, R. 65–66.

6. The SSA's regulations specify that "[a]ny work (jobs) that you can do must exist in significant numbers in the national economy (either in the region where you live or in several regions of the country)." 20 C.F.R. § 404.1561 (1984). The transcript of the hearing recounts Dr. Lawrence's statement on the availability of the five suggested jobs as follows: "[T]hese jobs ... would vary in numbers from approximately from three hundred to a thousand in the greater Washington D.C. Area which include in the region which were located." Tr. at 8, R. 51. Dr. Lawrence did not describe the national availability of such jobs. The appellant currently resides in the District of Columbia.
 The appellant does not here challenge *per se* the availability of jobs in the area, but rather whether he is suited to perform those jobs. We

clerk, flagman, custodian, watchman, and light porter. Dr. Kuhagen disputed a number of Dr. Lawrence's conclusions. We discuss in turn how each of three different characteristics of the appellant—his mental skills, his ability to walk or stand, and his involvement with alcohol—might affect the appellant's prospects for employment. We conclude that the ALJ lacked substantial evidence for the determination that the appellant was capable of performing a wide range of light and sedentary work. We are constrained to do so primarily because there is no substantial evidence that the appellant can find employment in at least four of the five types of jobs whose listing by a vocational expert was the only record evidence that the appellant can hold down any job.

## I

■ Our scope of review in cases involving disability determinations under the Social Security Act is a narrow one. *See* 42 U.S.C. § 405(g) (1982) ("The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...."). It is clearly the duty of this court, however, as it is the duty of the District Court, to engage in a careful review of the record for substantial evidence to support the conclusions of the ALJ. *See Vance v. Heckler,* 757 F.2d 1324 (D.C.Cir. 1985). We note at the outset that discharging our duty in this case is made significantly more difficult by the poor quality of the transcript of the crucial hearing. We reproduce excerpts from the transcript exactly as they appear in the record to illustrate our point.[7]

leave to the ALJ upon remand to determine whether, using the standards set forth here, the appellant is in fact qualified to hold enough jobs to meet the requirements of 20 C.F.R. § 404.-1561.

7. We are unable to determine whether these difficulties stem from the transcriber's carelessness, from the acoustics of the hearing room, or from inferior recording equipment used in making the transcript. Whatever the cause of the difficulties, it is the responsibility of the SSA to produce a reasonably readable transcript. *See* 42 U.S.C. § 405(g) (1982) ("As part of his answer [to the complaint by a claimant that the claim

## II

### A. *Appellant's General Mental Skills*

■ Mental skills may properly be considered as a non-exertional factor in determining disability. *See* 20 C.F.R. § 404.1505 (1984) ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical *or mental* impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.") (emphasis added). Because the appellant's mental skills, in light of his exertional limitations, border on those low enough to qualify him automatically for disability payments,[8] proper consideration of the effect of appellant's mental skills upon the availability of employment is especially important.

Dr. Kuhagen performed two different types of intelligence tests on the appellant. The first type was an IQ test, which yielded IQ measures in the categories of "verbal IQ," "performance IQ," and "full-scale IQ." The second type was a series of achievement tests, which yielded grade-equivalent scores in reading, spelling, and arithmetic. The findings of these tests are described above. *See supra* p. 911. A summary of the test results, dated March 21, 1983, was included as Exhibit 42 in the second hearing. *See* R. 158–60.

The ALJ appears to have asked Dr. Lawrence if the latter had seen Dr. Kuhagen's report:

Q You've had an opportunity to review the prosed or not to propose the

was improperly denied] the Secretary shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."). If counsel for the government was correct in his understanding that the SSA will soon install improved recording equipment in its hearing rooms, Tape of Oral Argument, May 1, 1985, then we applaud the SSA for taking steps to allow us to review a more intelligible record. We hope our applause is not (INAUDIBLE).

8. *See supra* notes 1 & 2.

exhibits which have been received in evidence?

Q Yes.

Q And you had an opportunity to review in detail the report of Dr. Kuhagen, dated March 21, 1983?

A Yes.

Q With Phycological evaluation?

A Yes.

Tr. at 6, R. 49. The ALJ then asked Dr. Lawrence to express an opinion as to which jobs the appellant could hold in light of the appellant's mental skills:

Q ... Now considering [appellant's problems] from an exertional standpoint, and considering further the results of the testing that's set forth in Dr. Kuhagen's report namely that he has a verical I.Q. of '82, and a performance I.Q. of '70, and a full scale I.Q. of '76, and the results of the testings as set forth in that report. Do you have an opinion as to whether or not there are any jobs in existence and have been since February of 1982, which Mr. Cunningham could perform from an exertional stand point and whether or not the I.Q. and other facters as set forth in the report would further have a bearing on his ability to perform (INAUDIBLE)?

A I do.

Q And would you express your opinion?

A Yes, the types of work that I will note in the light and are seditary qualifications, would be worked or could be done by a person with a twelfth grade education which I believe is what Mr. Cunningham has, which would be a level-four on the indication alone with the scale of the dictionar of dictionary occupational titles. It would also be consistant with a person's functional ability in the little average range or dominal range of verbal capacity under waste (Phonetic) it would not require more of the low average ability in respect to arithmatic and spelling.

Tr. at 7, R. 50. Dr. Lawrence then went on to describe five suggested jobs.

Reading this exchange as best we can, it appears that the ALJ noted that Dr. Law-rence was to consider both the IQ testing and the grade-equivalent testing. He mentioned all three of the IQ test scores determined by Dr. Kuhagen "*and* the results of the testing." Logically, this latter phrase should refer to the non-IQ tests performed for Dr. Kuhagen's report, one set of which was the grade-equivalent tests and the other set of which was a test of manual dexterity. We think it unlikely that the ALJ had in mind only the manual-dexterity tests when he mentioned "testings." The ALJ's reference to "I.Q. and other factors as set forth in the report" similarly indicates that he wished Dr. Lawrence to consider all aspects of the report.

It also seems likely that Dr. Lawrence referred to both the IQ testing and the achievement testing in his reply, although for us to reach this conclusion requires a bit of deductive reasoning. A popular subspecies of the IQ test, and the one administered to the appellant, is the Wechsler Adult Intelligence Scale. *See* R. 161 (appellant's IQ test score sheet). Its acronym, WAIS, sounds similar to the "waste" that the transcriber considered the phonetic equivalent of the word spoken by Dr. Lawrence in the last sentence quoted above. In addition, we note that the grade-equivalent tests have discrete categories for ability in spelling and arithmetic (and a third category for reading ability). *See* R. 162. The IQ test has a component labelled "arithmetic," but none labelled "spelling." It seems reasonable to assume that Dr. Lawrence's reference to "low average ability in respect to arithm[e]tic and spelling" is therefore a reference to the grade-equivalent tests rather than to the IQ test.

■ We are disturbed, however, by Dr. Lawrence's statement that the jobs he mentioned "would be worked or could be done by a person with a twelfth grade education which I believe is what Mr. Cunningham has." It is undisputed that the appellant has in fact completed the twelfth grade. Since that achievement, however, the appellant has suffered a stroke and been addicted to alcohol, two illnesses that may have significantly diminished his mental faculties. The testing that he has undergone

since those illnesses in fact shows mental skills far below the twelfth-grade level. We note that the SSA's regulations state that " '[e]ducation' is primarily used to mean formal schooling or other training *which contributes to your ability to meet vocational requirements.*" 20 C.F.R. § 404.1564(a) (1984) (emphasis added); *see also id.* § 404.1564(b) (formal education completed many years before impairment began may no longer be useful or meaningful in terms of ability to work). We therefore believe that it would have been clearly incorrect for the vocational expert to have considered the appellant's mental skills as equivalent to those of the average recipient of a high-school diploma, and that any evidence adduced on that basis could not serve as substantial evidence for determining that the appellant could hold the jobs available to the average high-school graduate.

Dr. Lawrence did state that the jobs he mentioned were open to those with a twelfth-grade education and "would *also* be consist[e]nt with a person's functional ability" in a range that appears to describe appellant's mental skills. It is possible to infer from this statement that Dr. Lawrence considered both the appellant's schooling and the appellant's functional limitations. The ALJ in his opinion similarly noted that the appellant "possesses a high school education (but has limited intellectual abilities and cognitive skills)." Opinion of ALJ at 7, R. 14. Certainly the mere fact that Dr. Lawrence or the ALJ mentioned the appellant's twelfth-grade education does not mean that they were incapable of also taking into account the appellant's mental skills as revealed by recent testing. Nonetheless, the appellant's high-school education is essentially irrelevant if it makes no contribution to his ability to meet vocational requirements, and we hesitate to infer from the garbled testimony before us that the jobs that "could be done by a person with a twelfth grade education" are exactly the same as those that could be done by someone functioning at the fourth- to sixth-grade level.

The second exchange between the ALJ and Dr. Lawrence regarding the appellant's mental skills does not dispel completely our fears that Dr. Lawrence credited the appellant with the mental skills of a high-school graduate:

Q ... Now you've mentioned several jobs here that he could perform within the exertional limitations. Has the non-exertional factors as set forth in the report of Dr. Kuhagen, have they all been considered in reaching our determination, your opinion rather that he can perform these jobs?

A I believe so but I would need to look over his report again to make certain that he (INAUDIBLE).

Q Exhibit 42, that's so much a conclusion, but the results of the I.Q., his test results.

A The only factor your Honor that I did not consider is the records to alchol abuse,[9] I did not consider that because it is unfare as to the fact of a portion of limitations, that of a particular.

Q I wasn't concerned about that, I was primarily concerned of as a result, you considered his I.Q. as somewhat plus the results of the various of the various tests which were administered?

A I have.

Tr. at 10–11, R. 53–54. Once again, it would be charitable to characterize the transcript as clear. Nonetheless, both the ALJ and Dr. Lawrence do seem to be discussing both the IQ and the grade-equivalent tests, and Dr. Lawrence seems to acknowledge that he has taken these factors into consideration.

■ Dr. Kuhagen, the vocational expert called by the appellant, clearly believed that the appellant's mental skills would increase the difficulty of the appellant's obtaining employment. His opinion as to how the appellant's mental skills would affect his chances of obtaining a particular job was somewhat more pessimistic than that of Dr. Lawrence:

---

**9.** This statement by Dr. Lawrence is incorrect. He also failed to consider the appellant's difficulties with standing and walking. *See infra* p. 920. In addition, it is unclear whether he considered the appellant's difficulties with writing. *See infra* p. 918.

Q The ... question was what will low I.Q. have a baring on jobs?

A I'm not sure exactly how to answer that except that it certainly doesn't help.... Seventy is the [I.Q.] level in which he is functioning, and it's going to impare his performance on these kinds of jobs.

T. at 26–27, R. 69–70. Nevertheless, the ALJ may choose one expert's opinion over the other so long as there is substantial evidence to support the chosen view.

■ On balance, we would hesitate to reverse the ALJ's decision on the basis of his treatment of mental skills alone. The ALJ appears to have made a conscientious effort to ensure that Dr. Lawrence examined the results of intelligence testing administered to the appellant; Dr. Lawrence may have considered all of those limitations before proffering the five jobs he thought suitable. Nonetheless, the poor state of the record makes it difficult for us to say flatly that the ALJ's treatment of mental skills was correct, particularly since we cannot be certain that Dr. Lawrence considered only that portion of the appellant's education still contributing to the appellant's ability to hold a job. On remand, the ALJ should therefore take particular care to ensure that the vocational experts are aware at every step of their analysis that the appellant's IQ indicates borderline mental skills well below what one might expect from someone with a high-school education. If the vocational experts consider any job in which a high-school diploma contributes to the likelihood of a person's being hired, the experts must consider how a prospective employer is likely to treat an individual who has recently suffered a stroke that may have led to a diminution in mental capacity and who currently functions with significantly less mental acuity than one ordinarily garners from a high-school education.

### B. *Appellant's Writing Skills and the Uniform Supply Clerk Job*

Dr. Lawrence suggested that the appellant could be employed as a uniform supply clerk. Tr. at 8, R. 51. His description of that job indicates that some ability to write is a prerequisite:

Q What does a uniform supply clerk do?

A Be a person that would work in settings such as industrial settings or perhaps in hospitals, large nursing homes, and with issues applying and fitting uniforms and lenins and things such as this, and would have to keep records of the amount of supplies that would be issued. That's simply a tally of the but not required any extensive writing or record keeping of it.

Tr. at 8–9, R. 51–52. Under questioning from his attorney, the appellant testified that he has a good deal of difficulty in writing:

Q ... Mr. Cunningham are you able to write.

A No, just sign my name.

Q Is there anything other than signing your name?

A Well I can make a few figures.

Q What problem have if any do you have with writing?

A Well as I said I can sign my name and make a few figures.

Q Why can't you do anything more, that's what we want to know?

A I can write a little bit but (INAUDIBLE).

Q Well I would say the record is subject a course agreement that the claimant signed his name deliberately.

A I have trouble with my thinking ability, if I could think you know I could do a number of things, I think I could. See you asked me a question and I have to think of it for two minutes before it come out and I can answer it.

Tr. at 22, R. 65. The appellant's limited range of writing skills might be sufficient to qualify him as a uniform supply clerk if he could write quickly. In fact, however, the evidence is uncontradicted that the appellant's writing is extremely labored. *See* Tr. at 24, R. 67 (testimony of Dr. Kuhagen) ("I did note ... that in administering the spelling section of the wide ranged

Achievement Test to Mr. Cunningham that he must write the words, that it took an extremely long time to administer due to his labored attempts to print the words."); Reconsideration Disability Report of Leon Cunningham, Social Security Administration, at 5, R. 107 ("The [appellant] had extreme difficulty in signing his name. It took him a considerable amount of time to sign all these forms."). This is unsurprising given that the right-handed appellant[10] has significant degenerative changes in his right elbow, and that his stroke affected his right-side motor functions. *See* R. 119, 151.

After a good deal of confusion during the proceedings, Dr. Lawrence agreed that significant difficulty in writing might prevent the appellant from obtaining employment as a uniform supply clerk:

Q With respect to the uniform supply clerk's job, there are records to be kept, is that correct?

A There would be a tally that would need to be kept on the basis of the number of the expense (Phonetic) or taking. Yes, that I would be able to count.

Q Would you consider the claimant, Cunningham's right arm would have an adverse effect on his ability?

A Not on the basis of the assumption that Judge Dirlam (INAUDIBLE).

Q Do you have any questions?

A Yes, on an, as evidence in the record I can't put my finger on it which indicates that the claimant has difficulty writing?

Q His ability in the exhibits, you may have come across it. Do you recall that?

A That's no kind of question.

Q Answer my question.

A I don't know.

Q Opposed to a hypothetical question.

A The claimant has difficulty writing, he can barely write his hand, his name, but that has not effect on his ability to perform the job of supply clerk.

ALJ: The job would not require writing, but it would require taking account and taking numbers and doing this amount of record keeping. I don't know, if he can't write his name he can't (Tape turned).

Q (INAUDIBLE).

A Checks in some other places you'de have to make numbers to keep track of the amount of supplies for example that would dealing out or brought in.

Q But there is some writing on that job?

A Oh yes you would have to be alble to use a writing instrument.

Q If you assume that he'd even have as difficulty writing his signature.

A What do you base that on, the doctor reports that, your own physician say's "he can write his name legibly with his right hand."

Q But that's with difficulty.

A Where does it say that?

Q Well.....

A Let's see the report you submitted?

Q Well....

A Alright it's hypothetical.

Q Well, if he has difficulty of signing his name does that make any difference with respect to the job that you say he could do as a supply clerk?

A It's, I would say that it would probably require longer for him to keep the records and make the marks, therefore his work productivety would be slowed, the exact amount of reduction in productivety is uncertain based upon the hypothetical that you've noted. If it should be reduced by as much as fifteen percent then this would significantly reduce his capasity to work. If it is less than that then it would not significantly reduce that.

Tr. at 18–20, R. 61–63. The record at no place reveals any estimate of the percentage loss in productivity that the appellant might suffer because of his writing problem. The only quantitative measure available that would appear relevant is a man-

---

**10.** *See* Vocational Report on Leon Cunningham, Social Security Administration, at 5, R. 107 (appellant "held his right arm and hand very stiffly, and did not use them at all except to sign his name").

ual-dexterity test on which the appellant scored below the 1st percentile. R. 163. We are further disturbed by the reasonable inference from the testimony above that Dr. Lawrence did not consider the appellant's writing difficulty in compiling his list of possible jobs.

Dr. Kuhagen was skeptical of the appellant's ability to hold the job of uniform supply clerk in light of his writing difficulties:

> [B]ased on my observation in giving [the spelling portion of the achievement test] is to how long it did take that would significantly reduce his production. I would seriously question that he would be able to meet what ever production quota's might be demanded of him in a job such as that.

Tr. at 24–25, R. 67–68.

■ In light of all the factors discussed above, we are constrained to conclude that no substantial evidence supports the ALJ's determination that the appellant could be employed as a uniform supply clerk. If the supply-clerk job is to be considered on remand as suitable for the appellant, the evidence must show that the appellant's writing difficulties would not prevent him from obtaining such a job.

### III

The jobs of flagman [11] or watchman,[12] two of the five jobs suggested by Dr. Lawrence, require significant standing or walking.[13] There was some controversy at the hearing as to the appellant's ability to stand or to walk:

Q Mr., Dr. Lawrence, with respect to the job of flaggman, that would require him to stand practically all day?

**11.** Q And the flaggman is this the type of flight method on construction sight?
A Right, a control person on a construction cite or a if it's not traffic control it would have to do with perhaps keeping the person's out of a particular construction area at certain times. Tr. at 9, R. 52.

**12.** Q And the watchman, is that a, where about?
A It could be at least one of three settings, it could be a night watchman where you'de be

A Yes.

Q And have you observer the (INAUDIBLE) that the claimant feels that his right foot feels frozen (Phonetic)?

A Yes.

Q And you don't think that that would make any difference?

A That was not a part of the hypothetical question, that I considered.

Q You will consider it as part of your consumption, would that make a difference?

A What restrictions would that place upon Mr. Cunningham?

Q [A?] I am assuming then his ability to stand and walk, I know it, or I see that his walk is not a normal walk.

A If it interferrs with his ability to stand and walk to a point where he could not do that for a certain amount during the day, and if you could specify that time demention, then I could respond to you with respect to each of these positions. The only way that I can do that is to question the claimant.

Dr. Lawrence Examines Claimant:

Q Well when I said that I didn't have any further testimony that was related to his past history. But Mr. Cunningham with respect to your ability to stand and walk, does your right foot make any difference?

A Yes, sometimes it does. In the mornings I can't walk.

Q You cannot walk?

A Yes, some mornings I can walk good my feet feel like they're swollen in the morning, infact they feel that way all

stationed at a booth walk around, it could be a security type of person in ability sitting at a desk. These woulld be all unarmed though or it might be a security person in another type of office or relevant building. *Id.*

**13.** Indeed, jobs in the light-work category are generally considered to "require[ ] a good deal of walking or standing," 20 C.F.R. § 404.1567(b) (1984). Strength is also a criterion. *Id.*

**921**

the time. Like they're swollen or like they're sleeping and then some mornings I can barely walk on them, and some mornings I can walk good on it.

Q Do you, could you stand all day or most of the day?

A No.

Q Do you walk?

A Yes, I could walk around some days and some days I can't.

Q Why not?

A Because of my leg. The foldum (Phonetic) of my leg.

Q Your right leg?

A Yea. It's in the feet.

Q In light of the testimony of the claimant (INAUDIBLE) gives me the conclusion that he could be a flaggman.

Q It depends on the number of days that he can walk, he would have to be able to function at least five out of seven days of the week. He would have to be able to function anywhere from six to eight hours per day in order to be able to function in this type of position.

A [Q?] His testimony would seem to be non relyable, the fact that he said he can't get through it sometimes but he can get through it other times. If it's more than twice a week and he has no control over when it is then it is absentyism and probably would be more than approximately a day a month, this would be considered excessive and with significantly reduced to passitive work and a particular type of work.

Tr. at 11–13, R. 54–56. The testimony of Dr. Kuhagen on this issue was more focused:

Q Dr. Kuhagen, with respect to the job of flaggman, in your opinion, could Mr. Cunningham perform on such a job?

A I think that it would be very difficult for him in light of a couple of factors: one the limitation imposed on him by the stroke and particularly into problems with his foot and leg as he has noted in earlier testimony in terms of standing for long periods of time. Secondly, the difficulty with regard to the alchol abuse....

Tr. at 23–24, R. 66–67. Dr. Kuhagen had similar reservations with respect to the appellant's ability to be a custodian:

Q With respect to the job of building custodian, do you have any opinion to whether Mr. Cunningham could fold in such a job?

A Again I think, there the physical limitations of a strong (Phonetic) remember quite a bit. Mr. Cunningham does walk cautously (Phonetic) and as we stated before, just in terms of standing for a long period of time that that would be difficult for him. So putting those two factors together I would have a hard time seeing that he could qualify for a position such as that.

Q Because of his walking limitations?

A Yes. He is cautious in the terms of the way he does walk, and even as we noted earlier as a flaggman just standing for a period of time would be very difficult. So to add to that the continuous need for lifting and walking around, to dust and sweep things and so on. I think fatigue facter would enter into that.

Tr. at 25, R. 68.

Although once more the transcript is so garbled as to cast into doubt the validity of any inference we might make, we believe it is reasonable to infer several points from this testimony of the appellant and the two vocational experts.

First, we note that the ability to stand and walk on a regular basis is a crucial component of the jobs offered by Dr. Lawrence as suitable for the appellant. Both experts agreed that, given some sporadic absenteeism, an applicant would have a difficult time obtaining the flagman job. After briefly questioning the appellant, Dr. Lawrence, who had not in his search for potential jobs considered the appellant's complaints about his legs, stated that the appellant could still be a flagman despite the appellant's testimony that his legs bothered him a great deal on some occasions. Dr. Kuhagen, who had some contact with the appellant before the hearing, concluded that the appellant's difficulties with

his legs were severe enough to combine with the appellant's other problems to make it very difficult for the appellant to hold the jobs of flagman, custodian, or watchman, *see* Tr. at 25–26, R. 68–69. The appellant testified that he had sporadic but debilitating problems with his legs. No other testimony rebutted the appellant's assertions. If one were to consider only the hearing testimony, therefore, one would be forced to conclude that the appellant had significant problems with his legs, that there was no substantial evidence to show that he could overcome these problems and hold a job as a custodian or watchman, and that there was a serious question as to whether the appellant could be employed as a flagman.

■ Testimony by a claimant as to a particular disability is insufficient evidence, however, unless supported by medical evidence. *See* 20 C.F.R. § 404.1508 (1982) ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms."); *id.* § 404.1528(a) ("*Symptoms* are your own description of your physical or mental impairment. Your statements alone are not enough to establish that there is a physical or mental impairment.") (emphasis in original). The ALJ based his decision that the appellant could stand long enough to perform the offered jobs on the appellant's medical records:

> While the claimant alleges on-going problems with prolonged standing, it is noted that none of the recent medical reports make mention of any significant impairment or functional limitations of the lower extremities. Therefore, [I] do[ ] not find such allegations to be supported by the objective medical evidence of record and consequently believe[ ] that the claimant presently retains the residual functional capacity to stand long enough to carry out the duties of light and sedentary work activity.

Opinion of ALJ at 5, R. 12. An examination of those medical records reveals a steady improvement in the appellant's ability to walk.[14] There is no specific evidence, however, that the appellant's right leg has improved so much that it could not give him sporadic but serious trouble.

Upon the appellant's admission to the hospital for treatment of his stroke on January 10, 1981, he could not move his right side at all. R. 119. A few weeks later, an employee of the SSA who interviewed the appellant noted that he "walked slowly [and] with difficulty." R. 96 (interview of Feb. 23, 1981). Seven months after the stroke, an examining physician stated that the appellant's gait was "very good" but that the appellant "still ha[d] significant and persistent disorganization of motor function in the right arm and right leg with marked disturbance of dextrous movements in spite of the good gait and station." R. 113 (report dated Aug. 11, 1981). The patient's physician reported in February of 1982 that the appellant had had a "remarkable improvement" in response to treatment for the stroke, with some continuing difficulties in his arms but "no other abnormalities." R. 116 (report dated Feb. 24, 1982). At the time of the appellant's discharge from the Providence Hospital after treatment for alcoholism on June 24, 1982, the examining physician noted that he had a "relatively normal" gait. R. 151. And finally, a summary of a medical examination of the appellant on March 14, 1983, recounts that the appellant was "able to ambulate in [the physician's] presence without any difficulty." R. 156.

The examining physician on this most recent exam did note the appellant's complaint that "his right foot feels as if it is frozen and that he can't walk some mornings on arising." R. 155. Despite this complaint—perhaps because the visit was apparently designed chiefly to examine the appellant's upper-body difficulties—the

---

**14.** Although the ALJ's opinion mentions only the appellant's problems with standing, the medical evidence is in fact chiefly concerned with the appellant's ability to walk rather than to stand. We shall assume that both abilities are related closely enough that the medical evidence on walking is relevant to standing.

physician did not go on to examine the appellant's legs or feet, but seems rather to have assumed on the basis of the appellant's gait that day that the appellant's complaint was groundless.

■ Although we find the trend in the medical evidence in this case to be clearly towards a normal gait, and thus towards a concomitant absence of standing difficulties, we are unable to say that this trend towards health is sufficient evidence from which to conclude that its endpoint has been achieved. No one has recently examined the appellant's legs and feet and pronounced them healthy, despite his relatively recent documented problems and his continuing complaints. We particularly believe such an examination to be necessary in light of the fact that, as Dr. Lawrence testified, the appellant need only suffer occasional difficulty with standing or walking to make him unable to hold the flagman's job. There is no evidence from which to assume that employers for other light, unskilled jobs are more tolerant of absenteeism.

### IV

After an arrest for driving while intoxicated, the appellant entered Providence Hospital on June 5, 1982, for treatment of alcoholism. The results of this treatment were apparently encouraging. *See* R. 151 ("significant progress was noted by the staff and by the patient toward the end of the program"), 152 (condition on discharge described as "Stable. Good understanding. Good motivation."). There was no evidence submitted that the appellant has any continuing problems with alcoholism. The issue before us is rather whether the ALJ adequately considered the effect of the appellant's history of alcoholism upon his prospects for employment. We note again that the ALJ must consider "all relevant facts" in determining whether the appellant can obtain employment.[15]

Dr. Kuhagen testified that the history of the appellant's bouts with alcohol would greatly harm his chances of employment as a flagman:

> [T]he difficulty with regard to the alchol abuse which has been mentioned, I think that would pose a tremendous problem in terms of qualifying in a job as a flaggman when that record gets revealed as well as his arrests for drunk and driving.

Tr. at 24, R. 67. Dr. Kuhagen had similarly based doubts about the appellant's abilities to obtain a job as a watchman:

> Again I think his arrest for driving while intoxicated would enter into that. I believe people who serve as guards and watchmen need to have a fairly clear police record.

Tr. at 25, R. 68.

Dr. Lawrence's opinion about the matter is somewhat more difficult to discern, but he appears to have considered only whether continued alcohol abuse was present rather than whether the stigma of past abuse might make it more difficult for the appellant to obtain the suggested jobs:

> Q You have not considered the claimant's alcoholic addiction?
>
> A No I haven't.
>
> Q That in the presence of that and there is in evidence I believe a statement signed by the claimant to the
>
> [Page Missing from Transcript]
>
> CONTINUED EXAMINATION OF ATTORNEY:
>
> Q In the light of the history of alcholism, he was hospitalized for some time in '82, and he was arrested for drunk and driving. Would that have any affect on his reliability with respect to the job to mention?
>
> A It potentially could, it would depend upon with enough cause to continue to drink a frequency with he drink's, the amount of consumption as well as when this consumption takes place. Obviously during this 4/43 to 9/21/83 at which time he was incarcerated. He would certainly not be alble to work during that time.
>
> Q Well I have no questions about that.

---

15. *See supra* note 4.

A In '82, depending on how long he was involved in treatment, the nature of the treatment and then, (INAUDIBLE).

Q · Well that's a matter of record, we have a report on that day.

A As I said, that was not part of the original assumption, so you are going to have to provide me with some functional limitations that are imposed as a result of the alcholism for me to be able to respond to that.

Q You (INAUDIBLE).

A I am not instructed to provide functional limitations that pose as the result of either medical or physical examines.

Q In your practice, if you are confronted with such a report and you have the excess (Phonetic) or potential vocational ability of an individual would you take that, would you feel qualified . . . . . . .

A Which report are you referring to Sir?

Q The report of his hospitalization, and the problem of the hospital?

A Oh akay. In June of '82,?

Q Right.

A Exhibit 39.

Q In other words, would you feel qualified to asses the affect this would have on the potential for a vocational employment?

A I could make assesments, in other setting I do not do that in this setting.

Q Well, asuming that you asked to make an assesment, what would it be?

A I would decline to do so, unless I was constructed to do by the Administrative Law Judge.

Q Your Honor.

ALJ: You can put any questions up that you want to up and then I'll rule out department (Phonetic) request if he doesn't want to answer.

A Well what's the question?

Q The question is in your practice if you are confronted with a report similar to this and you had asses vocational detentionals, would you feel qualified to asses it's impact on his ability to work. And then the doctor said that he didn't want to answer.

ALJ: Yes, you can answer that.

Dr. Lawrence: May I see the report then Sir?

ALJ: Are you referring to the Exhibit 39 [the records concerning appellant's hospital stay for treatment of alcoholism]?

ATTORNEY: I have it handy.

ALJ: This is the admission of June 5, 1982, is that the one that you are looking at?

ATTORNEY: Yes, June five.

Dr. Lawrence: Based upon this report then I would suggest that they thought the condition was stablized. If there was insight of good motivation, the prognosis qould seem to be positive, there was an absence of black out tremmer seizers (Phonetic) there is not an indication of how much had been drunk daily, so I would say on the basis of this there seemed to be nothing that would indicate any ominous signs of potential continuation. That would not negatively influence me in the types of jobs that I have included.

Tr. at 13–17, R. 56–60.

Dr. Lawrence's conclusion in the final sentence quoted above apparently refers only to "potential continuation" as the factor that would not negatively influence his conclusions about the appellant's ability to obtain the suggested jobs. Similarly, the ALJ's discussion of the appellant's alcoholism mentions only that the appellant does not currently appear to be an alcoholic:

[I am] aware that the claimant has had problems with alcoholism and was hospitalized for such in the summer of 1982; however, the record fails to demonstrate any on-going alcohol abuse or significant associated mental or physical residuals. Thus, [I do] not find that the claimant's problems with alcoholism to be such as

to significantly interfere with work activities.

Opinion of ALJ at 5, R. 12.

 In light of the fact that Dr. Kuhagen specifically testified that the appellant's history of alcoholism and arrest for drunken driving would significantly reduce his chances of obtaining jobs as flagman or watchman, and that Dr. Lawrence and the ALJ concluded only that the appellant was not currently addicted to alcohol, on remand the ALJ must consider how the appellant's record of alcoholism and arrest for drunken driving affects his chances for employment.

**V**

Because we do not find substantial evidence to support the ALJ's determination that the appellant is capable of a wide range of light and sedentary work, we remand the case to the District Court with instructions for it to remand the case to the SSA. On remand, the agency should ensure that any vocational expert proffering jobs suitable for the appellant take into account only that portion of the appellant's education that still contributes to his functional abilities. The agency should have before it the results of a recently obtained medical exam of the appellant's lower extremities before deciding whether the appellant's complaints of severe but occasional problems with walking or standing are credible. Finally, the agency must consider the impact of the appellant's prior history of alcoholism and his arrest for driving while intoxicated upon his chances for future employment.

*Vacated and Remanded.*