**Jacob LEE, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health & Human Services, Defendant.**

No. 93 CV 4132.

United States District Court,
E.D. New York.

Dec. 27, 1994.

Jacob Lee, pro se.

Zachary W. Carter, U.S. Atty., E.D.N.Y. (Jody Kasten, of counsel), Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiff brought this action to review a final determination of defendant Secretary of Health and Human Services (the "Secretary") denying plaintiff's claim for disability insurance benefits and Supplemental Security Income benefits under the Social Security Act (the "Act"). The Secretary moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### I

Plaintiff, born on May 29, 1943, has an eighth grade education and a performance scale IQ of 75. He worked as a stock clerk from 1971 until 1983 and as a dietary aide from 1984 until April 20, 1988, and participated in a sheltered rehabilitative training workshop from June 1991 until February 1992.

Plaintiff says that he has been disabled since April 20, 1988. Various physicians have diagnosed him as having several physically disabling conditions, including asthma, diabetes, glaucoma, and a herniated disc.

The Social Security Administration denied plaintiff's October 11, 1991 application for benefits both initially and upon reconsideration. After a hearing on February 19, 1993 an Administrative Law Judge ("the ALJ") found him not disabled. The ALJ made the following formal findings:

(1) Plaintiff met the Act's disability insured status requirements from April 20, 1988 to at least April 26, 1993.

(2) He stopped working in April 1988 but began working in a sheltered workshop in 1991.

(3) The medical evidence establishes that he does not have an impairment or combination of impairments equal to one listed in the regulations.

(4) His subjective complaints are not consistent with the medical findings; the as-

sessment of the treating source that he could perform normal activity; the assessments of the examining physicians; his ability to engage in activities including participation in a sheltered workshop five days a week, shopping, cooking, using public transportation, and caring for his personal needs; and the positive response to treatment; and are not credible to the extent he alleges.

(5) His residual functional capacity for the full range of sedentary work is reduced by his inability to work in a dusty environment.

(6) He is unable to perform his past relevant work as a dietary aide and a stock clerk.

(7) He has a limited education, and has no acquired work skills that are transferable to the skilled or semiskilled work functions of other work.

(8) Based on his age, education, work experience, and capacity for sedentary work, Rule 201.18 would direct a conclusion of "not disabled."

(9) Although his additional nonexertional limitations do not allow him to perform the full range of sedentary work, using Rule 201.18 as a framework for decisionmaking, there are a significant number of jobs in the national economy that he could perform, including assembler of computer parts, laboratory [sic, read lavatory] attendant, packager, and telephone order clerk. These jobs exist in significant numbers in the national economy.

The Appeals Council denied plaintiff's request for review on July 30, 1993. This action followed.

## II

■ Because plaintiff proceeds *pro se,* the court reads his complaint especially liberally. *See Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Plaintiff says that because he suffers from a variety of physical impairments and an unspecified mental impairment, presumably his relatively low IQ, the Secretary's determination of no disability is not supported by substantial evidence.

■ The court may overturn the Secretary's determination only when it is not supported by substantial evidence. 42 U.S.C. § 405(g). The relevant medical and vocational evidence may be summarized as follows.

### A. *Medical Evidence*

Plaintiff has had asthma since childhood and diabetes mellitus at least since 1985. He takes medications including Alupent, Prednisone and insulin and frequently visits pulmonary medicine and diabetes clinics to receive outpatient treatment for these conditions. From 1988 to 1990, he was hospitalized three times for periods ranging from four to ten days because he had difficulty breathing. In September and October 1991, he visited a diabetes clinic three times complaining of recurrent numbness and tingling in his left arm.

Plaintiff also has degenerative disc disease and a herniated disc, as indicated by x-rays performed on April 21, 1988 and a computerized tomography scan performed on May 1, 1990. Finally, he was diagnosed as having early possible chronic glaucoma on May 29, 1990.

Dr. Russell Gee, an orthopedic surgeon, examined plaintiff on May 1, 1990. He reported that plaintiff related a history of lower back and hip pain from 1987, and recommended that plaintiff should "select work that does not require much lifting, bending, carrying, prolonged standing, [or] prolonged walking" and "should limit his lifting to not more than twenty pounds."

Dr. F. Tellez, an ophthalmologist, examined plaintiff on May 29, 1990 and noted that while his visual field was mildly restricted, his corrected bilateral vision was 20/20. Dr. Tellez diagnosed early possible chronic glaucoma, but could not say whether the disease was stable or progressive. Nonetheless, he concluded that given the early diagnosis, plaintiff's prognosis was good, and that his condition did not require him to avoid any particular activities or working conditions.

Dr. Robert Axel, a psychologist, interviewed plaintiff on July 18, 1990. He found

plaintiff to function within the borderline range of intelligence with a Full Scale IQ of 78, a Verbal Scale IQ of 82 and a Performance Scale IQ of 75, but also observed that he "appeared brighter than he tested." He noted that although plaintiff was able to learn a simple four step assembly task immediately, he "worked at a slow pace (10th % ile)" and "his fine-finger dexterity, though adequate, was not high level." Dr. Axel opined that plaintiff would have the ability to work faster with practice. He observed that plaintiff was motivated to work and recommended that he "select a non-stressful job which will not exacerbate [his] symptoms and one which he can intellectually and physically handle."

Dr. Howard Finger, a consultative examiner, saw plaintiff on January 2, 1992. He noted that plaintiff's gait was slow but normal, and that while he had no difficulty sitting or standing, he had significant difficulty lifting and carrying. He diagnosed plaintiff as having chronic bronchial asthma, chronic lower back disorder, arthralgia in the left shoulder, peptic ulcer disease, insulin-dependent diabetes mellitus, and glaucoma.

Dr. Gerald Greenberg, a medical expert, testified at plaintiff's administrative hearing. Based on the exhibit file, he stated that plaintiff had asthma with frequent episodes of symptoms, but that this condition did not meet or equal a listed impairment. He also noted that plaintiff experienced some hand pain, and some diminished sensation to pinprick due to his diabetes, but that neither were of "such significance as they would affect his work-related activity."

Because of plaintiff's back pain and herniated disk, Dr. Greenberg stated that he "would have to hedge on whether or not he would be capable of light activity on a regular competitive basis." He concluded that plaintiff's ability to engage in light or sedentary work would be limited by "exposures to dust, changes in temperatures and things of that sort which are usually applied to respiratory problems, particularly asthma."

B. *Vocational Evidence*

Plaintiff worked as a stock clerk at various liquor stores from 1971 to 1983. His activities included lifting and stacking boxes of liquor, and occasionally serving customers or assisting with inventory.

Plaintiff worked at Booth Memorial Hospital in Flushing, New York as a dietary aide from 1984 until he allegedly became disabled in April 1988. His duties included washing dishes and pans, preparing trays of food, and pushing food trucks. Plaintiff says that although he enjoyed the work, the steam tables and other environmental conditions in the cafeteria and kitchen aggravated his asthma.

Sometime between April 21, 1988 and May 1, 1990 plaintiff applied to participate in a rehabilitative training program administered by the New York State Education Department's Office of Vocational Rehabilitation (the "OVR").

Vocational Evaluator Elizabeth Fernandez observed that during a preliminary evaluation period from December 10, 1990 to January 9, 1991 plaintiff "had difficulty understanding both written and oral instructions" and "responded slowly to questions and often sat with tasks for long periods seeming confused." She concluded that although plaintiff "presented himself as a pleasant and cooperative individual" who "seemed very motivated to work," his "mostly inferior clerical and complex manual work sample scores and [slow] speed," in conjunction with his physical limitations, restricted his occupational choices. She recommended that plaintiff pursue sheltered employment because his goal of becoming a mailroom messenger "appeared unrealistic."

Subsequently, the OVR assigned plaintiff to a rehabilitative workshop where he performed individual and team packaging and assembly operations. In a letter dated September 11, 1991 Vocational Counselor Kate DiVittorio reported that during a Personal Adjustment Training ("PAT") period from June 18, 1991 to September 10, 1991, plaintiff was a competent worker, but that he was frequently absent "due to medical appointments." Because plaintiff needed to improve his attendance and strengthen his vocational skills, DiVittorio recommended that plaintiff participate in a second bench assembly PAT.

In a letter dated February 10, 1992 DiVittorio related that during a PAT period from October 17, 1992 to February 7, 1992 plaintiff was an "excellent worker" despite his poor attendance record. She said that plaintiff had "exhibited gains in his overall performance" but still needed to improve his attendance and increase his concentration. She recommended that he begin sheltered employment in the bench assembly field on or about March 9, 1992.

The record does not indicate if or when plaintiff entered sheltered employment. Plaintiff testified that the OVR eventually dropped him from the rehabilitation program because his attendance was too sporadic. He stated that because of his frequent medical treatment, he was only able to work two or three days a week.

Dr. Owen Bernstein, a vocational expert, testified at plaintiff's administrative hearing. He stated that significant numbers of unskilled sedentary assembly jobs performed in a dust and moisture free environment exist in the area's economy. He listed assembler of computer parts, assembler of meters, lavatory attendant, and telephone order clerk as possible occupations for plaintiff, although he also stated that he was reluctant to recommend a telephone order job in view of plaintiff's limited education.

### III

The ALJ concluded that although plaintiff's various physical impairments limit him to performing sedentary work, he is capable of substantial gainful employment because significant numbers of sedentary jobs performed in a dustfree environment exist in the national economy. The ALJ did not consider the effect of plaintiff's alleged mental impairment in reaching this conclusion.

Under the Secretary's regulations, if an unemployed claimant has impairments that preclude performance of his or her relevant past work, an ALJ may look to the rules set out in Appendix 2 to 20 C.F.R. Part 404, Subpart P (the "Rules") in evaluating the claimant's ability to engage in substantial gainful activity. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a). If the ALJ's findings of fact regarding a claimant's vocational factors and residual functional capacity coincide with all of the criteria of a particular Rule, that Rule directs a conclusion of whether or not the claimant is disabled. *Id.*

But because the Rules address only exertional limitations, if a claimant has an impairment or combination of impairments that results in both exertional and nonexertional limitations, the ALJ must consider "all the relevant facts" in making a determination as to disability. *Cunningham v. Heckler,* 764 F.2d 911, 914 (D.C.Cir.1985); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). The Rules merely provide a framework for consideration of how much the claimant's work capability is further diminished by the nonexertional limitations. *Id.*

Although plaintiff met all the Rule 201.18 criteria, the ALJ did not automatically adhere to the Rule's directed outcome, and properly considered the effects of nonexertional limitations stemming from plaintiff's asthma upon his ability to work. But the ALJ erred by not taking into account limitations resulting from plaintiff's mental impairment.

Plaintiff's relevant IQ of 75, *Cunningham,* 764 F.2d at 913 n. 1, is a severe impairment causing nonexertional limitations. *Cockerham v. Sullivan,* 895 F.2d 492, 496 (8th Cir.1990). Substantial vocational evidence demonstrates that plaintiff's borderline intelligence restricts his capacity to perform some job activities, such as understanding and acting upon instructions. Because the ALJ should have considered whether nonexertional limitations related to plaintiff's mental impairment further impeded his ability to work, the Secretary's decision is not supported by substantial evidence. Accordingly, the court remands the case to the Secretary to consider whether the combined effects of plaintiff's mental and physical impairments preclude him from working.

### IV

The court remands the case to the Secretary to determine whether the combined ef-

fects of plaintiff's mental and physical impairments preclude him from working.

So ordered.